Submitted June 18, 2013, reversed and remanded June 18, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICKEY DALE CHARLES,
*Defendant-Appellant.*

Jackson County Circuit Court
101545MI; A149306

331 P3d 1012

Peter Gartlan, Chief Defender, and Erik Blumenthal, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

Hadlock, J., dissenting.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction for driving under the influence of intoxicants (DUII). ORS 813.010. He assigns error to the trial court's denial of his motion to suppress evidence discovered as a result of what he contends was an unlawful seizure under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. In particular, defendant argues that he was unlawfully stopped when an officer knocked on the door of his residence, asked him to come outside and talk, accompanied him to a place outside to conduct field sobriety tests, read him his *Miranda* rights, and then asked for his consent to a patdown search. The state responds that, under the totality of the circumstances, a reasonable person would have understood that he or she was free to leave and, therefore, defendant was not stopped under either the state or federal constitution. We agree with defendant that the circumstances in this case amounted to a stop under Article I, section 9. Accordingly, we reverse and remand.

We review a trial court's ruling on a motion to suppress for legal error and are bound by the court's findings of historical fact if there is evidence to support them. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). To the extent that the court did not make express findings on disputed factual issues, we state the facts consistently with the court's ultimate conclusion. *Id.* We state the facts of this case in light of those standards.

Just before 8:00 p.m. on April 10, 2010, Groom, a deputy with the Jackson County Sheriff's Department, received a call about a vehicle stuck in a ditch in front of a residence on Butte Falls Highway. Approximately 15 minutes later, Groom pulled into defendant's driveway in a marked patrol car and saw a pickup truck with its front end stuck in a large ditch on the side of the road, near the driveway. The truck was registered to defendant.

It appeared to Groom that the driver of the truck had taken too wide a turn when attempting to enter the driveway. Groom believed that the circumstances indicated that the person who had been driving the truck may have been impaired and, with that in mind, he "went to look for

an impaired driver at the residence." Groom, who was in uniform, knocked on the door of the residence, and it was answered by defendant's wife. She told Groom that she had been driving the truck and had gotten stuck in the ditch when she swerved to avoid hitting a dog, but Groom did not believe that she was being truthful. A second deputy, Avery, who had arrived at the residence near the same time as Groom, was also present while Groom spoke with defendant's wife. Groom then asked Avery to go across the street and speak to the witness who had called in the report about the truck, and Avery did so.

While he was talking with defendant's wife, Groom saw defendant, who appeared to be very intoxicated, "staggering around in the house." Defendant then sat down on the couch in the view of Groom. Groom asked defendant, who is hard of hearing, to come out and speak with him and, in response, defendant went out on the porch or front landing of the residence. Immediately after defendant went outside, he walked with Groom "into a flat area where [Groom intended] to have [defendant] perform field sobriety tests." Groom then read defendant his *Miranda* rights because he was conducting an investigation of a possible DUII or "some kind of crime." Defendant acknowledged that he understood those rights. Groom then asked defendant for permission to pat him down for weapons—Groom's "common practice" after giving *Miranda* warnings—and defendant agreed. While conducting the patdown, Groom located the keys to the truck in defendant's pocket. Thereafter, defendant made incriminating statements and was subsequently arrested for DUII.

Before trial, defendant filed a motion to suppress, asserting that he had been unlawfully seized before the patdown search and that evidence obtained as a result must be suppressed under Article I, section 9, and the Fourth Amendment. After holding a hearing, the court denied the motion to suppress.

On appeal, defendant contends that the trial court erred in denying his motion to suppress, arguing that, under the state and federal constitutions, Groom's actions in coming to his residence, asking him to come out and talk,

reading him *Miranda* warnings, and asking for consent to pat him down amounted to a stop. Further, he asserts that the stop was not justified by reasonable suspicion. *See State v. Ehly*, 317 Or 66, 80, 854 P2d 421 (1993) ("[I]f a police officer is able to point to specific and articulable facts that give rise to a reasonable inference that a person has committed a crime, the officer has 'reasonable suspicion' and hence may stop the person for investigation."). The state, for its part, does not contend that there was reasonable suspicion to support a stop or that, if the encounter amounted to a stop, suppression of the evidence is not required. Rather, the state argues only that, "[b]ecause asking defendant to come outside, reading him his *Miranda* rights, and asking for consent to pat him down did not effect a stop, the trial court correctly denied defendant's motion to suppress."

Thus, the question we must resolve in this case is whether the encounter amounted to a stop. Under Article I, section 9, individuals are guaranteed the right to be "secure in their persons * * * against unreasonable search, or seizure."[1] Because "[n]ot all governmental intrusions trigger the protections guaranteed" by Article I, section 9, "we must first decide whether the action is either a 'search' or a 'seizure' within the meaning of that section." *State v. Juarez-Godinez*, 326 Or 1, 5, 942 P2d 772 (1997).

> "'Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed "stops," which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not.'"

*State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013) (quoting *State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013)). "The thing that distinguishes 'seizures' * * * from

---

[1] We begin by considering defendant's contentions under state law. *See State v. Juarez-Godinez*, 326 Or 1, 5, 942 P2d 772 (1997).

encounters that are 'mere conversation' is the imposition, either by physical force or through some 'show of authority,' of some restraint on an individual's liberty." *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010) (quoting *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010)). The test to determine whether a seizure has occurred under Article I, section 9, "is an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Backstrand*, 354 Or at 399 (citing *Ashbaugh*, 349 Or at 316). The "inquiry is necessarily fact-specific and requires an examination of the totality of the circumstances involved." *Id.*

As the court in *Backstrand* observed, "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *Id.* at 400. Therefore, police may "'approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them.'" *Id.* (quoting *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991)). A seizure occurs only where the officer's conduct "would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens." *Id.*

Thus, the concept of a "show of authority," in this context, refers to "a reasonable perception that an officer is exercising his or her official authority to restrain," *id.* at 401; that is, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs," *id.* at 400-01. A constitutionally significant "show of authority" can be inferred from "the content of the questions [asked by a police officer], the manner of asking them, or other actions that police take (along with the circumstances in which they take them)." *Id.* at 412. Under those principles, for example, a "mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does

not, in and of itself, result in a seizure." *Id.* at 410; *cf. State v. Rodriguez-Perez*, 262 Or App 206, 212, 325 P3d 39 (2014) (where officers approached the defendant and his brother, told them that they suspected that the men were violating the law, asked for identification, and returned to their patrol car to verify the validity of the identification, "[u]nder the principles articulated in *Backstrand*, [the] circumstances were sufficiently coercive to result in a seizure").

In this case, were we to look at each piece of the encounter between defendant and the officer independently, we would not necessarily conclude that any one piece, standing alone, amounted to a stop. For example, an officer may, generally, approach a citizen's front door and knock on it without effecting a seizure. *See State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995) ("[A]bsent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior."). Likewise, we could not conclude that an officer's request that a person come out of a residence to talk to the officer, on its own, constitutes a stop. *See State v. Shaw*, 230 Or App 257, 262-63, 215 P3d 105, *rev den*, 347 Or 365 (2009) (an officer's request that the defendant come over and speak with him was not a stop); *cf. State v. Dahl*, 323 Or 199, 207-08, 915 P2d 979 (1996) (police order that the defendant come out of the house with his hands up was an unlawful seizure under Article I, section 9, because it effectively "deprived [the] defendant of any choice in the matter"). For the same reason, an officer's suggestion that a person walk together with the officer may not evidence a stop. *See State v. Crandall*, 197 Or App 591, 595, 108 P3d 16 (2005), *rev'd on other grounds*, 340 Or 645, 136 P3d 30 (2006) (a person is stopped "if the individual is forced to alter his course of conduct or is summoned away from a task"). Nor would an officer's request for consent to conduct a patdown search alone amount to a stop. *See State v. Kinkade*, 247 Or App 595, 599-601, 270 P3d 371 (2012) (the defendant was not stopped when an officer walked up to him on the street, asked if he could talk with him, and then inquired if he could pat him down). However, the inquiry is not whether each of the officer's actions here, examined separately, would convey to a reasonable person that the person

was not "free to terminate the encounter or otherwise go about his or her ordinary affairs." *Backstrand*, 354 Or at 401-02. Rather, the question is whether all of the officer's actions combine to form a whole greater than the sum of its parts; that is, whether, based on the totality of the circumstances, a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement.

We note that the state appears to be of the view that the officer's giving of *Miranda* warnings should not be a consideration in whether defendant was stopped. It cites the Oregon Supreme Court's decision in *State v. Ayles*, 348 Or 622, 237 P3d 805 (2010), as support for its contention that "giving *Miranda* warnings should not be taken as effecting a restraint on a person's liberty." In *Ayles*, the court did not address the question of whether the giving of *Miranda* warnings is a factor to be considered in evaluating whether a person was stopped for purposes of Article I, section 9. Instead, in that case, the court considered whether the giving of *Miranda* warnings attenuated a prior illegality and, in that context, evaluated whether "the giving of *Miranda* warnings itself has a coercive effect that negates the voluntariness of subsequent statements." *Id.* at 635. The court observed that the "giving of the warnings, which is intended to assure voluntariness, cannot be used * * * to prove a contrary theory." *Id.* at 635-36.

That, of course, is not the issue in this case. Rather, here, we must evaluate the totality of the circumstances before the patdown to determine whether a reasonable person, in those circumstances, would have believed that the officer had significantly deprived him or her of his or her liberty or freedom of movement. In our view, the officer's giving of *Miranda* warnings is a factor to be considered in determining whether the officer's actions conveyed a restraint on defendant's liberty.

In *Miranda v. Arizona*, 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966), the Supreme Court held that the Fifth Amendment to the United States Constitution required that particular warnings be given when "a person has been taken into custody or otherwise deprived of his

freedom in any significant way." The Oregon Supreme Court requires the same warnings in those circumstances under Article I, section 12, of the Oregon Constitution. *See State v. Shaff*, 343 Or 639, 645, 175 P3d 454 (2007) (*Miranda* warnings are required only where a person is in full custody or "in circumstances that create a setting which judges would and officers should recognize to be compelling" (internal quotation marks omitted)). Those warnings are that a person "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Miranda*, 384 US at 444. Analogously, a person is not entitled to the presence of an attorney during a police interview unless the person "is in custody, *i.e.*, not free to leave" (under Article I, section 12) or "his or her freedom has been 'significantly restrained'" (under the Fifth Amendment). *State v. Terry*, 333 Or 163, 172, 37 P3d 157 (2001). Thus, when an officer informs a person that he is entitled to the presence of an attorney during the course of further conversation with the officer, it would generally be reasonable to conclude that that entitlement is because the person "is in custody, *i.e.*, not free to leave." *Id.* Indeed, the popular understanding of *Miranda* warnings is that they are given when an individual is placed under arrest. *See Commonwealth v. Donaldson*, 786 A2d 279, 285 (2001) ("It is our belief that the average layperson would equate being *Mirandized* with being placed in police custody.").

The reasoning of the Florida Supreme Court in *Caldwell v. State*, 41 So 3d 188, 201-02 (2010), is instructive. There, discussing the reading of *Miranda* warnings in determining whether a defendant was stopped under the Fourth Amendment, the court noted:

> "*Miranda* warnings are a formality of arrest and are required *only* at the time of an arrest or prior to custodial interrogation. Further, the warnings are associated in the public mind with the spectacle of an individual being placed under arrest. Therefore, it is not unreasonable to conclude that an individual who is given *Miranda* warnings during what begins as a consensual encounter may interpret those warnings as a restraint on his or her freedom. For this reason, courts that have considered the application of

*Miranda* in the context of an on-the-street police encounter have generally found it to be at least a factor in determining whether an individual has been subjected to an illegal investigatory stop under the Fourth Amendment. *See, e.g.,* [*United States v.*] *Poitier,* 818 F2d [679, 683 (8th Cir 1987)]; *United States v. Lara,* 638 F2d 892, 898 n 10 (5th Cir 1981) ('Giving *Miranda* warnings in a police-citizen encounter which is otherwise a nondetention interrogation may very well elevate such an encounter to a seizure * * * in light of the public's association of *Miranda* warnings with an arrest.'); *see also United States v. Montgomery,* 377 F2d 582, 587 (6th Cir 2004) (noting that the district court listed the reading of *Miranda* rights as one factor indicating that a reasonable person in the defendant's position would not have felt free to leave).

"This conclusion on the part of a reasonable person would be further supported by the fact that outside the context of an arrest or custodial interrogation, not all of the stated rights apply. In particular, *Miranda* requires that suspects be advised that they have the right to an attorney and that if they cannot afford an attorney one will be provided for them. * * * While this advisory warning is true during a custodial interrogation, it is not true during a consensual encounter or investigatory stop."

(Footnote omitted; emphasis in original.) We have implied much of the same in *State v. Cordray,* 91 Or App 436, 442, 755 P2d 735 (1988) ("We conclude that a stop did not occur until the officers approached defendant and began reciting his rights to him.").

In this case, we are not called upon to determine whether the giving of *Miranda* warnings in the course of a police interview, by itself, constitutes a sufficient "show of authority" to create a constitutional seizure. *See Caldwell,* 41 So 3d at 203 (concluding that there was no stop when officers gave the defendant *Miranda* warnings and informed him that he was not under arrest but that the officer merely wanted to make sure that the defendant was aware of his rights). Rather, it is the totality of the circumstances here that would have conveyed to a reasonable person that he or she was not free to end the encounter and depart. The officer, accompanied initially by a second officer, approached defendant's residence in the evening and spoke with defendant's

wife to ask about criminal conduct. At least part of that conversation was in defendant's presence. Although defendant's wife gave an explanation for the location of the truck, the officer did not accept that explanation and asked defendant, who was seated inside the house, to come outside and talk. At that point, a reasonable person in defendant's shoes would have concluded that he or she was the subject of a criminal investigation. Once defendant was outside on the porch, the officer then walked defendant to a flat area so that he could conduct field sobriety tests. By then, defendant's course of conduct had been altered twice by the police actions in beckoning him to the porch and then leading him into a flat area for field sobriety tests.

The officer also read defendant his *Miranda* warnings and asked for consent to conduct a patdown search. Given that *Miranda* warnings are required only in circumstances where a person is *not* free to leave (where a person is arrested or in compelling circumstances), a person given those warnings in circumstances like those here would interpret them as communicating some restraint on his or her freedom. Finally, in context, the request for a patdown search implied that a search was constitutionally appropriate, that it was necessary either because defendant would remain in the officer's presence for some time and therefore present a risk to the officer's safety or because defendant was being searched incident to being taken into custody. Either implication contributes to the reasonable conclusion in this context that defendant was detained. *Compare Ashbaugh,* 349 Or at 317-18 ("Although it is possible to restrict a person's liberty and freedom of movement by purely verbal means," a request to search purse did not amount to a seizure under Article I, section 9, because the preceding conversation between the police officer and the defendant was "relaxed and nonconfrontational" and the "content" of the questions could not be perceived as a "show of authority").

In short, under all of the circumstances presented here, we conclude that the officer's actions constituted a show of authority such that a reasonable person would have believed that the officer had intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement.

Accordingly, the encounter in the case was a stop, and the trial court erred in denying the motion to suppress.

Reversed and remanded.

**HADLOCK, J.,** dissenting.

This case began when a deputy sheriff responded to a report about a vehicle that was stuck in a ditch in front of a house. After going to the house and speaking to defendant's wife, who gave an explanation for the stuck vehicle that the deputy disbelieved, the deputy noticed defendant "staggering around in the house," apparently intoxicated. After defendant sat down on a couch inside the house, the deputy asked defendant "if [the deputy could] speak with him," and defendant went outside.[1] The deputy testified that he and defendant walked "out into [a] flat area" where the deputy intended to have defendant perform field sobriety tests, but the record does not reflect what questions, statements, or actions by the deputy may have prompted defendant to walk with him to that area. As the pair walked, the deputy testified, he "read [defendant] his *Miranda* rights."[2] After defendant acknowledged that he understood those rights, the deputy asked, as was his common practice, whether he could pat down defendant for weapons. During the resulting consensual patdown search, the deputy found the keys to the vehicle that was in the ditch.

The majority concludes, based on the totality of the circumstances, that defendant had been "stopped" by the time that the deputy patted him down and that (in the absence of any claim by the state that the stop was justified

---

[1] The deputy first testified that he "ask[ed]" defendant if he could speak with him, and responded affirmatively when questioned whether he had "ask[ed] the defendant out of the house." In addition, the deputy specifically denied having ordered defendant to leave the house. However, when the deputy was cross-examined about the sequence of events, he responded, "Yeah," when asked whether he had told defendant to come out of the house. But the deputy subsequently clarified that he had *not* ordered defendant to come to the door, and reiterated that he had only asked defendant to do so. The trial court found that the deputy "asked [defendant] to step outside."

[2] The deputy did not explain exactly what he said when he read defendant his *"Miranda* rights." Accordingly, I, like the majority, presume that the deputy read defendant the standard advice of rights under *Miranda*, including the right to counsel. *See State v. Acremant*, 338 Or 302, 318 n 13, 108 P3d 1139 (2005) (describing *Miranda* warnings).

by reasonable suspicion of criminal activity or a safety threat) the trial court should have suppressed evidence that the deputy discovered as a result of that stop. The majority focuses on two aspects of the encounter: the giving of *Miranda* warnings and what it characterizes as two alterations in "defendant's course of conduct * * * by the police actions in beckoning him to the porch and then leading him into a flat area for field sobriety tests." 263 Or App at 588. With respect, I dissent.

As the Supreme Court recently explained in *State v. Backstrand*, 354 Or 392, 402 n 11, 313 P3d 1084 (2013), in determining whether an encounter between a police officer and another person amounted to a "stop" of that person, a court's analysis should focus on "the officer's words and actions and what *they* would convey to a reasonable person." (Emphasis in original.) Thus, the question this case presents is whether a reasonable person would believe that the deputy had "intentionally and significantly restricted, interfered with, or otherwise deprived [defendant] of his or her liberty or freedom of movement," when the deputy asked defendant if he could speak with him, walked with defendant to the "flat area," read him *Miranda* warnings, and requested consent to pat him down. *Id.* at 399; *see also id.* at 402 ("Again, what is required is a show of authority by which, through words or action, the officer's conduct reasonably conveys that the officer is exercising his or her authority to significantly restrain the citizen's liberty or freedom of movement."). I would hold that the deputy's questions and actions did not have that effect.

First, the deputy's requests of defendant—that he come outside to speak with the deputy and that he allow the deputy to perform a patdown search (as well, perhaps, as an implicit request that defendant walk with the deputy to the "flat area")—would not, standing alone, constitute a stop. In that regard, it is worth emphasizing that the deputy did not, at any point in the encounter, order defendant to move in a particular direction or otherwise change his physical location. The deputy repeatedly denied having ordered defendant out of his house, and the trial court found that the deputy merely asked defendant to come outside. Moreover, nothing in the record suggests that the deputy

*directed* defendant to follow him to the "flat area" where he intended to administer field sobriety tests. Accordingly, I do not find the same significance that the majority does in defendant's movement from inside the house to the flat area outside.

Because the deputy's requests were just that—requests—they did not, alone, constitute a stop. "Rather, something more than just asking a question, requesting information, or seeking an individual's cooperation is required" before an officer can be said to have made "a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* at 403 (quoting *State v. Ashbaugh*, 349 Or 297, 317, 244 P3d 360 (2010)). Here, the majority finds that "something more" in the deputy's reading of *Miranda* warnings, which the majority describes as communicating that defendant had been arrested or otherwise was in compelling circumstances that had restrained his freedom. 263 Or App at 588. I agree that the *Miranda* warnings—at least, the recitation that defendant had a right to legal counsel—could reasonably suggest that defendant was the subject of a criminal investigation, perhaps even that the deputy believed that he had *reason* to detain defendant. However, that does not resolve the question of whether defendant was stopped. Rather, the question remains whether a reasonable person would conclude that the officer's words or actions *in fact* amounted to a significant restraint on defendant's liberty.

The majority's conclusion that the circumstances described above amounted to a stop is implicitly based on the notion that a law enforcement officer seizes a person if the officer's words or actions convey to the person that he or she is the subject of a criminal investigation. That conclusion is consistent with much of our pre-*Backstrand* case law. *See, e.g., State v. Dierks*, 257 Or App 88, 95, 306 P3d 653 (2013), *decision vac'd by order*, 354 Or 837 (2014) (concluding that the defendant had been stopped because "a reasonable person in defendant's circumstances * * * would have believed that * * * she was being subjected to a criminal investigation and was, therefore, not free to leave"). In my view, however, it conflicts with *Backstrand* and other recent Supreme

Court decisions. In *Backstrand* itself, Justice Walters wrote a concurring opinion in which she explained her view that a police officer's interaction with the defendant amounted to a stop "because the officer's communication and conduct would cause a reasonable person in [the] defendant's position to believe that he was the subject of a criminal investigation and therefore that he must stop, respond, and remain until the immediate investigation was complete." 354 Or at 418 (Walters, J., concurring in the judgment).[3] The majority, however, "decline[d] to debate whether a person in [the] defendant's position would have believed he was the subject of a 'criminal investigation'" because, it held, "the fact that an officer asks a citizen for cooperation *in the course of conducting a criminal investigation* is not a talisman in the [stop] analysis, as it is for Justice Walters." 354 Or at 396 n 4 (emphasis added). Thus, under *Backstrand*, a person may reasonably believe, based on an officer's words or conduct, that he or she is the subject of a criminal investigation, yet not have been *stopped* by the officer's actions.

The Supreme Court emphasized that point in other cases that it decided on the same day as *Backstrand*. In *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013), the court addressed the constitutionality of an interaction between police officers and two individuals who arrived at an apartment complex where the officers were executing a search warrant. The individuals, including the defendant, approached the apartment that was the focus of the warrant, but they briskly returned to their car after they saw officers searching the living room. *Id.* at 443. Three of the officers followed the individuals back to their car, explained that they were executing a search warrant, and said they were contacting the defendant and his companion to find out who they were, "what interest they might have had" with what the officers were doing at the apartment, or whether they knew the person who lived there. *Id.* The officers also asked the defendant and his companion for identification. The defendant

---

[3] Despite her disagreement with the *Backstrand* court's determination that no stop had occurred, Justice Walters concurred in the Supreme Court's ultimate decision that the officer had not *unlawfully* stopped the defendant because, she concluded, the stop "was constitutionally justified." 354 Or at 419 (Walters, J., concurring in the judgment).

denied that he had identification with him and gave a name that one of the officers knew was incorrect. That officer said to the defendant "you're not him, I recognize you," and asked the defendant to step out of the car. *Id.* at 444. The officer again asked the defendant whether he had identification, the defendant produced identification, and the officer "ran a warrant check on defendant" and discovered that he was wanted on an outstanding arrest warrant. *Id.* The defendant unsuccessfully moved to suppress evidence that the officers subsequently discovered. *Id.* at 445-46.

On review, the Supreme Court addressed whether the officers seized the defendant before they asked him to get out of the car. The court held that no seizure occurred before that point, even though the officers' explanation of what they were doing at the apartment complex "objectively conveyed possible suspicion that [the defendant and his companion] could be involved in criminal activity related to the apartment" and "equally conveyed that the officers were interested in whatever information the two might be able to provide." *Id.* at 453. "In all events," the court explained, "by those brief verbal exchanges and inquiries alone, the officers did not communicate an exercise of authority of the kind required for a seizure—*i.e.*, authority to restrain." *Id.* The court found significant that the uniformed officers "took no physical action other than to approach the parked car" and "requested no physical action from defendant and the driver at that point." *Id.* at 453-54. Even though there was one more officer present than there were people in the car, the circumstances "would not cause a reasonable person seated in the car to believe that the officers were significantly restricting his or her liberty." *Id.* at 454. The court went on to conclude that the defendant *was* seized later in the encounter, after an officer "expressed disbelief in defendant's identification of himself" and made "requests" that the defendant and his companion exit their car in a way that, under the circumstances, a reasonable person would have understood as "directives" that significantly restrained the defendant's liberty. *Id.* That later seizure, however, was justified, because once the defendant gave a false name to the officers, they had reasonable suspicion to detain him. *Id.* at 455.

Dissenting justices disagreed with the *Anderson* majority's analysis of when a seizure of the defendant occurred, focusing on whether the defendant would have believed that he was the subject of a criminal investigation:

> "When considered in combination, the facts that the officers were in the process of conducting a drug investigation, that the officers indicated that they considered defendant a potential suspect in that investigation, and that the officers asserted physical authority over defendant by surrounding the car in which he was seated, add up to a show of authority that would have conveyed to a reasonable person that he was the subject of a criminal investigation and therefore was not free to leave or go about his ordinary business until the immediate investigation was completed."

*Id.* at 457 (Walters, J., dissenting). Again, the majority of the court rejected that focus on whether the defendant would have believed the officers were investigating him for possible criminal activity, focusing instead on whether a reasonable person would understand that the officers had engaged "in a 'show of authority' that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." *Id.* at 450.

Similarly, in *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013), the Supreme Court held that a patrol officer did not stop the defendant when the officer—who previously had been interacting with defendant's companion—spoke with the defendant (who was, along with his companions, "milling around" in the parking lot of an apartment complex), asked the defendant whether he was "still on probation," requested the defendant's identification, used the information that he obtained from the defendant's license to check defendant's probationary status (as the defendant had asserted, he was no longer on probation), asked the defendant for consent to search, and then—after the defendant said that he would empty his pockets for the officer and, in doing so, attempted to hide items in his hand—repeatedly asked the defendant about the items he was removing from his pockets and what he was doing with his hands. *Id.* at 462-64.[4] None of those

---

[4] Toward the end of that "game of 'cat and mouse,'" another officer saw a small baggie in the defendant's fist, and subsequent events led to the discovery of

events resulted in a seizure, because the officer's actions did not "convey a restraint on [the] defendant's liberty," but instead, the officer made "verbal inquiries only" that "were not seizures." *Id.* at 470-71.

As in *Anderson* and *Backstrand*, a *separate* opinion in *Highley* focused on whether a police officer's inquiries would lead "a reasonable person [to] believe that he or she is being subjected to a criminal investigation and therefore must stop, respond, and remain until the immediate investigation is complete." *Id.* at 486 (Walters, J., dissenting). In such circumstances, the *Highley* dissent would have held, "the officer effects a seizure under Article I, section 9, of the Oregon Constitution." *Id.* (Walters, J., dissenting). But that was the dissenting view.

Considering the majority, dissenting, and concurring opinions in *Backstrand*, *Anderson*, and *Highley*, I derive the general principle that a police officer does not stop a person merely by making inquiries or by seeking information from the person in a way that reasonably could suggest that the person is the subject of a criminal investigation. Rather, the officer must say or do "something more" that "would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Backstrand*, 354 Or at 403.

Applying that principle here, I would hold that, although standard *Miranda* warnings may have suggested to defendant that he was the subject of a criminal investigation, that suggestion did not (either alone or in combination with the interactions between the deputy sheriff and defendant that preceded it) constitute a stop. The remaining question is whether, in some other respect, the *Miranda* warnings constituted the kind of "something more" that can transform an encounter into a stop. I would hold that they did not. The "something more" must be a police officer's words or actions that communicate that a person is required to comply with whatever subsequent requests the officer

---

baggies that contained methamphetamine. *Id.* at 465, 470. The defendant did not dispute the trial court's conclusion that the officer who spotted the baggie then had sufficient cause to force the defendant's hand open to reveal the drugs that the officer believed he possessed. *Id.* at 473.

may make. *Backstrand*, 354 Or at 403; *see Anderson*, 354 Or at 454 (The defendant was stopped when, in the totality of the circumstances, the defendant would have understood "officers' 'requests' to exit the car to be directives and would believe that his or her liberty was significantly restrained."). Here, the *Miranda* warnings would not have had that effect. By their very nature, the warnings explicitly communicate that a person is *not* required to speak with the police officer, thus at least implicitly communicating that the person is not required to comply with, for example, any subsequent request for consent to search. *See State v. Ayles*, 348 Or 622, 635-36, 237 P3d 805 (2010) ("The giving of [*Miranda*] warnings * * * is intended to assure voluntariness" and, therefore, "cannot be used * * * to prove a contrary theory"; rejecting the Court of Appeals' suggestion that the warnings could perpetuate a "person's perception that his or her liberty continued to be restrained as the officer pursued a criminal investigation by seeking consent to a search."). Because the deputy's recitation of the *Miranda* warnings did not communicate that defendant was required to comply with the deputy's subsequent requests, that recitation did not effect a seizure under Article I, section 9, either considered standing alone or in combination with the events that preceded it.

For similar reasons, I would conclude that defendant was not seized for purposes of the analysis under the Fourth Amendment to the United States Constitution. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 551 US 249, 254, 127 S Ct 2400, 168 L Ed 2d 132 (2007) (citations and internal quotation marks omitted). As under Article I, section 9, a "feel-free-to-leave formulation does 'not state the entire [federal] test for a "seizure" of a person by a non-forcible "show of authority."'" *Backstrand*, 354 Or at 402 n 11 (quoting *State v. Holmes*, 311 Or 400, 413, 813 P2d 28 (1991)). Rather, "the requirement that a reasonable person would not have felt free to leave is a *'necessary'* condition for a 'seizure' of a person but not a *'sufficient'* one where no force is used." *Holmes*, 311 Or at 413 (quoting *California v. Hodari D.*, 499 US 621, 628, 111 S Ct 1547, 113 L Ed 2d

690 (1991) (emphasis in *Hodari D.*). The Oregon Supreme Court recently has explained that, "[u]nder that more complete articulation of the federal test [found in *Hodari D.*], the analysis of what constitutes a seizure under Article I, section 9, and under the Fourth Amendment is not meaningfully different." *Backstrand*, 354 Or at 402 n 11. Accordingly, having determined that defendant was not seized for purposes of Article I, section 9, I also would hold that he was not seized for purposes of the Fourth Amendment.

In short, defendant had not been stopped at the time he consented to the patdown search, and the trial court therefore correctly denied defendant's motion to suppress evidence discovered as a result of that search. I respectfully dissent.