Submitted September 29, 2015, reversed and remanded July 26, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CLAUDIO CASTILLO NAJAR,
aka Claudio Najar-Castillo,
*Defendant-Appellant.*

Marion County Circuit Court
12C41943; A156660

401 P3d 1205

Peter Gartlan, Chief Defender, and Lindsey K. Detweiler, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Michael S. Shin, Assistant Attorney General, filed the brief for respondent.

Before DeVore, Presiding Judge, and Lagesen, Judge, and Flynn, Judge pro tempore.

## FLYNN, J. pro tempore

Defendant challenges the trial court's denial of his motion to suppress evidence that officers discovered after defendant consented to the inspection of a container that officers found during a "pat down" search. The trial court concluded that defendant was seized at the time of the search and that the seizure was authorized by officer safety concerns, rejecting defendant's argument that he was seized much earlier during the encounter and that the state failed to prove any lawful basis for the earlier seizure. Defendant argues that he was seized when, during the course of a conversation between the officer and defendant, who was sitting in a parked car, the officer asked to see defendant's license and then told defendant to reach for his wallet with only one hand. We have repeatedly held that similar directions to a citizen amounted to a seizure, and we conclude that defendant was, likewise, seized when the officer directed how defendant should move his hands to reach for his wallet. The state urges us to affirm the trial court on the alternative bases that the earlier seizure was also authorized by officer safety concerns or that defendant's ultimate consent was sufficiently attenuated from any illegality that the evidence should not be suppressed. However, neither argument was raised or addressed below, and the criteria for affirming a trial court on an alternative basis are not satisfied. Accordingly, we reverse and remand.

We review the denial of defendant's motion to suppress for legal error and, in doing so, "we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them." *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). To the extent that the trial court did not make express findings regarding disputed facts, we will presume that the court found the facts in a manner consistent with its ultimate conclusion, provided that the evidence would support such findings. *Id.* at 166. We describe the facts in a manner consistent with that standard of review.

## I.  BACKGROUND

A.  *Historical Facts*

Sheriff's deputies Hagan and Remmy were driving in a marked patrol car through an area with "a lot of stolen vehicles and cars that are broken into" when they noticed a car parked on the side of the road with the passenger door ajar. Hagan "thought it was a little unusual" because he had "found cars in that state before and they've been broken into." At the time, the sun was still rising and it was a "little bit foggy," so Hagan "couldn't quite see into it to know one way or the other if anybody was inside."

The deputies turned around, parked in front of the car, but on the opposite side of the street, and approached the car from both sides. Using flashlights to look inside the car, they saw two people—defendant in the driver's seat, with the keys in the ignition, and a woman in the passenger seat. Hagan knocked on the driver's side window, and defendant rolled it down. Hagan asked defendant what they were doing there and defendant responded, "Just talking. We sit here all the time."

Hagan then asked if defendant had his license and defendant replied, "I don't know" but began to reach toward his side. Defendant "touched * * * his right hand to the waist on his jeans" and then reached in a "fluid motion" toward the center console under the stereo with both hands. Hagan thought that defendant's movements were "kind of unusual." Hagan had an "immediate concern" when defendant touched his waistband because that is the most common area that he finds weapons on people who are carrying weapons. As a result of those concerns, Hagan "asked [defendant] to keep his hands where [Hagan] could see them." When defendant explained that his wallet was in the console area, Hagan "told him he could reach for it with one hand and he did do that." Hagan was not "yelling at [defendant] or anything like that at that point."

Defendant retrieved his wallet and gave Hagan a work ID, saying that he must have left his license at home. As their discussion continued, defendant reached twice

more toward the right side of his waistband, which caused Hagan to be concerned that defendant "might have been trying to hide a weapon or access a weapon." When defendant refused to consent to let Hagan search him for weapons, Hagan opened the car door and, ultimately, forcefully removed defendant from the car and placed him in handcuffs. Hagan then patted down the outside of defendant's clothing and found a pocket knife clipped to defendant's belt loop on the right side as well as two small objects in defendant's right pants pocket. Hagan asked if defendant "had anything illegal" in his pocket and defendant replied, "Yeah, you can take it out." Hagan then pulled out a small container, and defendant volunteered, "There's some crystal inside."[1]

## B. *Procedural Background*

The state charged defendant with one count of unlawful possession of methamphetamine, ORS 475.894. Before trial, defendant filed a motion to suppress. He argued that he was seized when Hagan told him how to use his hands to retrieve his identification. Defendant argued that the seizure at that point was not authorized by any exception to the warrant requirement and that all evidence obtained after Hagan unlawfully seized defendant should be suppressed "because defendant's subsequent consent to the search of his person and incriminating statements were the product of the preceding unlawful police conduct." The trial court ruled that defendant was not seized until later in the encounter and that the seizure was authorized by officer safety concerns, based on defendant repeatedly reaching toward his waistband even after being told not to do so. The trial court, thus, denied defendant's motion to suppress, and defendant was later convicted of unlawful possession of methamphetamine after a stipulated facts trial.

## II. DISCUSSION

On appeal, defendant again argues that he was seized when Hagan directed him to use his hands in a specific way to retrieve his identification, that the seizure was

---

[1] Defendant explained that he meant "crystal meth."

not authorized by the officer safety doctrine,[2] and that subsequent evidence and admissions must be suppressed. As set out above, the state urges us to affirm the trial court's conclusion that defendant was not seized at the point that he identifies, but also argues that, if defendant was seized at that point, we should affirm on either of two bases that the trial court did not address—that the officer safety doctrine authorized the seizure or that suppression is unnecessary because Hagan "did not use any information gained from any seizure to obtain defendant's consent to search his pocket containing methamphetamine." We conclude that defendant was seized when Hagan directed him to use his hands in a specific way to retrieve his identification and that the record does not permit us to resolve this case on either of the alternative bases identified by the state.

A. *Seizure Under Article I, Section 9*

For purposes of Article I, section 9, of the Oregon Constitution, which protects citizens from unreasonable searches and seizures, a "seizure" occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis omitted). Because there are a variety of police-citizen encounters, only some of which constitute a seizure for purposes of Article I, section 9, the determination of whether a person has been seized "necessarily is fact-specific and requires an examination of the totality of the circumstances involved." *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013).

*Backstrand* emphasizes the fundamental proposition that "the constitutional concern is with police-imposed restraints on citizen liberty, not with limiting contacts between police and citizens." *Id.* at 400. Thus, officers are

---

[2] Defendant also argues that the seizure was not justified by reasonable suspicion of criminal activity, anticipating a possible state position on appeal. However, the state did not advance that justification for a seizure below, nor does the state make that argument on appeal, so we do not address the reasonable suspicion doctrine.

"free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful." *Id.* (internal quotation marks omitted). An officer may also request a person's identification and retain the identification long enough to check its validity without those actions, in and of themselves, creating a coercive restraint on the person's liberty. *Id.* at 412-13. That is because "the fact that an individual * * * feels obliged to cooperate with the officer simply because of the officer's status is not the form or source of coercion that is of constitutional concern." *Id.* at 402.

However, an encounter that involves "something more" than just a person with officer status "asking a question, requesting information, or seeking an individual's cooperation" can become a seizure if "added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Id.* at 403. A "'show of authority' can be inferred from 'the content of the questions [asked by a police officer], the manner of asking them, or other actions that police take (along with the circumstances in which they take them).'" *State v. Charles*, 263 Or App 578, 583, 331 P3d 1012 (2014) (quoting *Backstrand*, 354 Or at 412 (brackets in *Charles*)).

Defendant argues that a reasonable person would construe Hagan's directions to use his hands in a specific way to retrieve his identification as a show of authority requiring compliance. To support his argument, defendant relies on *State v. Ruiz*, 196 Or App 324, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005), in which we held, *en banc*, that the defendant was seized when an officer told him to remove his hand from his pocket. Because we agree that *Ruiz* is controlling, we describe the facts of that case in detail. The officer in *Ruiz* approached the defendant, who was sitting with a companion in a public area that the officer knew to have a "bad problem with controlled substances." *Id.* at 326. After the officer discovered that the companion was holding a bindle in his mouth containing a white substance that the officer suspected was cocaine, the officer saw the defendant reach into his pocket. *Id.* Fearing that the defendant was

reaching for a weapon, the officer "told defendant to take his hand out of his pocket." *Id.* When the defendant complied, his hand was covered in a brown substance that the officer suspected was tar heroin. *Id.* That observation led to the discovery of five bindles of heroin. *Id.*

The trial court denied the defendant's motion to suppress, concluding that the officer's direction to the defendant was not a seizure, but we disagreed. *Id.* at 327. We concluded that when the officer told the defendant to remove his hand from his pocket, he exercised authority over the defendant that constituted a seizure, because "a person in defendant's position would not reasonably believe that he could walk away from his encounter with [the officer] without first taking his hand from his pocket, as [the officer] ordered him to do so."[3] *Id.* The full court agreed that the defendant was seized, although the majority concluded that the stop was justified by officer safety concerns. *Id.* at 329.

We have continued to identify similar directions given during a police-citizen encounter as amounting to a seizure. In *State v. Shaw*, 230 Or App 257, 264, 215 P3d 105, *rev den*, 347 Or 365 (2009), during course of conversation with a citizen, the officer became concerned about a tool in the citizen's hand and "told him to show me his hands." We concluded that, "because the officer effectively ordered defendant to show him his hands, this step in the encounter amounted to a seizure of defendant." *Id.* at 265. In *State v. Rudnitskyy*, 266 Or App 560, 564, 338 P3d 742 (2014), *rev den*, 357 Or 112 (2015), the defendant was sitting in a parked car with his window rolled down when a sheriff's deputy approached to investigate a report of a suspected drug transaction. *Id.* at 561-62. When the deputy reached the car window, defendant appeared to be trying to hide items that he knew to be associated with smoking heroin, and the deputy "ordered defendant and the passenger

---

[3] Although *Ruiz* predates *Backstrand* and *Ashbaugh*, it analyzes the police-citizen encounter under the same standard that the subsequent cases identify as the proper standard for identifying a stop—whether the officer's actions "would lead the person reasonably to believe that he or she is not free to leave." *Ruiz*, 196 Or App at 327. The state does not contend that our analysis of the circumstances in *Ruiz* would be different under *Ashbaugh* and *Backstrand*, and we conclude that it would not.

to place their hands on the dashboard." *Id.* at 562. We concluded "that the stop occurred at the moment that [the deputy] ordered defendant to place his hands on the dashboard of the Subaru." *Id.* at 564.

The state argues that *Ruiz* and the cases like it are distinguishable because Hagan did not "request any specific affirmative act—like taking a hand out of a pocket—that defendant would have felt he was required to complete before he could leave the car." Rather, he, "in effect, told defendant to refrain from doing something" while he reached toward his wallet. We can identify no constitutionally significant distinction, however, between the show of authority inherent in directing defendant to use his hands in a particular way to reach for his wallet and the show of authority inherent in directing a citizen to remove his hand from his pocket or to place his hands on the car dashboard. We conclude that Hagan's direction to defendant, here, was no less an exercise of authority than the officers' directions in the cases discussed above and was accompanied by circumstances that arguably contributed to a greater show of authority. The trial court found that, after defendant's initial furtive movements when Hagan asked to see his license, Hagan "says to him in a kind of—according to him, a kind of regular tone, 'Can I—keep your hands where I can see them. Go in with one hand,' which he did."[4] Although the trial court concluded that Hagan's instructions were not "intrusive" enough to amount to a seizure, that conclusion is not consistent with our holdings discussed above.[5]

In addition, the encounter began when two officers approached, from either side, a parked car in which defendant was sitting with the driver's-side door closed; shined their flashlights into the car; knocked on the window to get defendant's attention; and asked him to produce his license. Although the circumstances through that point may not

---

[4] The description is essentially identical to Hagan's testimony that, when defendant explained that his wallet was in the center console area, Hagan "asked him to keep his hands where [Hagan] could see them" and "told him he could reach for it with one hand."

[5] Although defendant relied on *Ruiz* in the trial court as well, the court's ruling does not explain the basis on which the court understood *Ruiz* to be distinguishable.

have amounted to a seizure, they provide context for the show of authority that followed. *See Charles*, 263 Or App at 585 (explaining that, we consider whether "all of the officer's actions combine to form a whole greater than the sum of its parts" in determining whether "a reasonable person would believe that the officer had intentionally and significantly deprived defendant of his freedom of movement"). As in *Ruiz*, *Shaw*, and *Rudnitskyy*, we conclude that Hagan's directions to defendant—under the totality of the circumstances—"would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *See Backstrand*, 354 Or at 403.

B. *Officer Safety*

The state argues that, if a seizure occurred at the point when Hagan directed defendant to use his hands in a specific way to retrieve his wallet, the seizure was justified by the same safety concerns that the trial court identified as authorizing Hagan to pull defendant from the car. "Officer safety" is one of the established exceptions "to the general rule that warrantless searches are *per se* unreasonable and therefore unlawful under Article I, section 9, of the Oregon Constitution." *State v. Davis*, 282 Or App 660, 666, 385 P3d 1253 (2016). The exception recognizes that an officer is not prohibited from taking

> "'reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present.'"

*Id.* (quoting *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987)). The state bears the burden to "establish that 'the officer subjectively believed that the defendant posed a threat' and 'that the officer's belief was objectively reasonable.'" *State v. Smith*, 277 Or App 298, 303, 373 P3d 1089, *rev den*, 360 Or 401 (2016) (quoting *State v. Rodriguez-Perez*, 262 Or App 206, 213, 325 P3d 39 (2014)). An officer's subjective belief that a defendant posed a threat is not objectively reasonable if it is based "on intuition or a generalized fear that the person may pose a threat to the officer's safety";

rather, it "must be based on facts specific to the particular person." *Id.*

The state recognizes that the trial court did not address whether the state proved that Hagan possessed an objectively reasonable belief that defendant "might pose an immediate threat of serious physical injury" at the point when Hagan told defendant how to reach for his wallet. Thus, we understand the state's arguments on appeal to be a request that we affirm the trial court's ruling as right for the wrong reason. Three considerations constrain our ability to affirm a trial court's ruling on a basis other than those on which the court relied: "(1) 'the facts of record [must] be sufficient to support the alternative basis for affirmance'; (2) 'the trial court's ruling [must] be consistent with the view of the evidence under the alternative basis for affirmance'; and (3) 'the record [must] materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below.'" *State v. Booth*, 272 Or App 192, 199, 355 P3d 181 (2015) (quoting *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (brackets in *Booth*)). The state argues that the trial court's determination regarding Hagan's safety concerns at the later point "applies with equal force to the request that defendant keep his hands in view" while he reached for his wallet and, thus, that we can affirm on that alternative basis.

We disagree. The court's finding that Hagan possessed the requisite subjective belief that defendant "might pose an immediate threat of serious physical injury" at the point when he removed defendant from the car is not equivalent to a finding that Hagan possessed the same subjective belief at the point when Hagan directed defendant to reach for his wallet with one hand. Indeed, Hagan's testimony would support the competing inference that it was only later in the encounter that he developed a specific concern about safety. He testified that he became "more and more concerned there was a weapon" as defendant "kept reaching in that area." He also testified that, although he had an "immediate concern" about weapons when defendant first touched his waistband, he "watch[es] everybody's hands, so it wasn't a real heightened event at that point." As we articulated the

obstacle in *Booth*, "the trial court did not engage in the fact-specific inquiry necessary to determine whether the state had carried its burden" of proving that Hagan's belief that defendant might pose an immediate threat to safety began with defendant's first suspicious movements. *See* 272 Or App at 199. Given the competing permissible inferences, we cannot affirm the trial court on this alternative basis.

C. *Exploitation*

Finally, the state argues that the evidence need not be suppressed because, even if Hagan unlawfully seized defendant when he directed the manner in which defendant should retrieve his wallet, defendant's ultimate consent to Hagan removing the container from defendant's pocket, and his admission that it contained "crystal," were "entirely independent of the purported illegality." The state relies on *State v. Unger*, 356 Or 59, 333 P3d 1009 (2014), in which the Supreme Court held that the state may defeat a motion to suppress evidence obtained through a search that follows illegal police conduct if the state proves that the defendant voluntarily consented to the search and that the defendant's consent was "unrelated or only tenuously related to the prior illegal police conduct." *Id.* at 79.

This is an argument that the state did not raise below, and, again, the criteria identified in *Outdoor Media*, preclude us from reaching this alternative basis for affirmance. *See* 331 Or 659-60. We cannot affirm the trial court's ruling because "the trial court did not engage in the fact-specific inquiry necessary to determine whether the state had carried its burden of proving that 'the consent was independent of, or only tenuously related to, the unlawful police conduct,' including 'an assessment of the actual police misconduct.'" *See Booth*, 272 Or App at 199 (quoting *Unger*, 356 Or at 86).

Moreover, even if the record were sufficient to support this proposed alternative basis for affirmance, we are instructed not to consider affirming on an alternative basis, "if the losing party might have created a *different* record below had the prevailing party raised that issue." *Outdoor Media*, 331 Or at 660 (emphasis in original). Had the state contended below—either in a written response to defendant's

motion to suppress or in argument at hearing—that defendant's consent was independent of any illegal seizure, defendant "might have created a different record." At a minimum, he might have chosen to testify about how the initial illegal seizure contributed to his ultimate consent and admission to possessing drugs. The state does not ask us to remand for further findings related to the suppression motion, and, in any event, we have previously declined to remand on issues for which the state bears the burden of proof and was aware of that burden at the time of the hearing. *See State v. Jones (A154424),* 275 Or App 771, 776, 365 P3d 679 (2015) (rejecting state's argument that case should be remanded for consideration of *Unger* factors, because "the burden has long been on the state to establish attenuation" and the factors set forth in *Unger* "as pertinent to the attenuation analysis are not new").

Reversed and remanded.