Submitted on remand from the Oregon Supreme Court February 6, resubmitted en banc September 21, 2020; reversed and remanded February 10, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TERESA SOTO-NAVARRO,
*Defendant-Appellant.*

Washington County Circuit Court
17CR39495, 16CR82211;
A166495 (Control), A166496

482 P3d 150

Defendant, a passenger in a car stopped by police for traffic violations, was ordered by an officer to keep her hands where he could see them. Soon thereafter, a drug sniffing dog circled the car and detected drugs in defendant's possession. Defendant moved to suppress the evidence of the drugs. She contended that she had been seized before the dog's deployment and that the dog's sniff unlawfully extended the seizure in violation of the state and federal constitutions. The Oregon Court of Appeals initially affirmed without opinion, and defendant petitioned for review in the Supreme Court. The Supreme Court remanded in light of its decision in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), which displaced the "unavoidable lull" doctrine. *State v. Soto-Navarro*, 366 Or 64, 455 P3d 37 (2019). Defendant renews her arguments on remand. The Court of Appeals took the matter en banc to determine whether an officer's directive to restrict hand movements constitutes a seizure under Article I, section 9, of the Oregon Constitution and, if so, whether that seizure had been unlawfully extended by the dog sniff under *Arreola-Botello*. *Held*: The trial court erred in denying defendant's motion to suppress. Defendant was seized by the officer's directive to keep her hands where he could see them, if not earlier. In light of the subject-matter limitations recognized in *Arreola-Botello*, and because the only plausible justification for defendant's seizure was the lawful processing of the traffic stop of the driver, the dog's sniff unlawfully extended the seizure of defendant.

Reversed and remanded.

En Banc

On remand from the Oregon Supreme Court, *State v. Soto-Navarro*, 366 Or 64, 455 P3d 37 (2019).

Janelle F. Wipper, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and John P. Evans, Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and David B. Thompson, Assistant Attorney General, filed the briefs for respondent.

Before Egan, Chief Judge, and Armstrong, Ortega, DeVore, Lagesen, Tookey, DeHoog, Shorr, James, Aoyagi, Powers, Mooney, and Kamins, Judges.

LAGESEN, J.

Reversed and remanded.

DeVore, J., dissenting.

## LAGESEN, J.

"[J]ust keep your hands where I can see them," Officer Leininger ordered defendant as he stood next to her car door armed and in uniform, his patrol car with its lights flashing not far behind, his partner, Deputy Gravel, at the driver's door of the Volkswagen Jetta in which defendant had been riding on the passenger side. She complied. Was defendant seized for purposes of Article I, section 9, of the Oregon Constitution?

We took this matter into full court to consider that question, a question we answer yes. That answer, combined with the Supreme Court's recent rejection of our longstanding Article I, section 9, "unavoidable lull" doctrine, in *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), means that the evidence supporting the conviction that defendant challenges on appeal should have been suppressed. Because the trial court, correctly applying the unavoidable lull doctrine later displaced by *Arreola-Botello*, concluded otherwise, we reverse and remand.

In a stop so pretextual the pretext got lost, Gravel and Leininger pulled over the Jetta in which defendant was a passenger. Gravel and Leininger were on a "street crimes mission" that night, "looking for narcotics and guns, and that kind of thing in the Cornelius area." As "part of the mission," they "had a dog attached to us to come to our traffic stops."

They stopped the Jetta because they had been informed by one source that the car had a narcotics connection,[1] and they had been informed by a different source—a narcotics officer for the City of Beaverton—that he observed the Jetta execute two traffic violations: a rolling stop followed by a too-wide turn. Although, according to Leininger, "it was a traffic stop," pulling the car over was part of their mission that night to find narcotics.

---

[1] In a later hearing addressing alleged *Brady* violations, Gravel testified that another deputy had told him that Hanted, the driver of the Jetta, was on his way to complete a drug deal with a confidential informant at a McDonald's. In response to defendant's motion to suppress, however, the state did not justify the stop based on the information it had about the drug deal about to go down.

After locating and then stopping the Jetta, Gravel and Leininger, who were armed and in uniform, left the patrol car with its overhead lights on and flashing. They approached and flanked the Jetta, with Gravel taking the driver side and Leininger taking the passenger side. Because he had been concerned by defendant's movements as he approached the car, Leininger directed her to "keep your hands where I can see them." She complied. Gravel and Leininger spoke with the driver and defendant, obtaining their names, but Tux,[2] the dog attached to their street-crimes mission, and his handler, Deputy DiPietro, arrived within 30 seconds of the start of the stop, soon circled the car, and detected drugs. No one gave any further thought to the California stop and too-wide turn reported by the Beaverton narcotics officer, and no one filled out a traffic citation. Instead, as was the point of that night's "street crimes mission" all along, Tux's detective work gave rise to probable cause to conduct a drug investigation. The investigation revealed that defendant had in her possession 70.28 grams of methamphetamine, multiple methamphetamine pipes, $3,231 in cash, a large quantity of empty plastic baggies, a digital scale, and eight cell phones. That discovery led to defendant's arrest and the indictment for one count of unlawful delivery of methamphetamine (charged as a commercial drug offense), ORS 475.890(2), and one count of unlawful possession of methamphetamine, ORS 475.894.

Defendant moved to suppress the evidence of the drugs, cash, phones, and paraphernalia. Among other things, defendant contended that she had been seized under both Article I, section 9, and the Fourth Amendment to the United States Constitution, before Tux's deployment, and that Tux's deployment then unlawfully extended the seizure in violation of each constitution. Relying on *State v. Clemons*, 267 Or App 695, 341 P3d 810 (2014), and *Rodriguez v. United States*, 575 US 348, 135 S Ct 1609, 191 L Ed 2d 492 (2015), defendant argued that, for purposes of the Fourth Amendment, she was automatically seized when officers

---

[2] The correct spelling of Tux's name is not clear from the record. The state spelled it "Tux" in its response to defendant's motion to suppress, but the transcript spells it "Tucks." We employ the version contained in the state's written briefing to the trial court.

stopped the car in which she was riding and that Tux's sniff unconstitutionally prolonged that seizure under *Rodriguez*. She argued further that, for purposes of Article I, section 9, "a sufficient show of authority occurred with the officers involved in the traffic stop of the vehicle to demonstrate that [defendant] was also seized under the Oregon Constitution," such that Tux's sniff unlawfully extended the scope of that seizure as well. Apart from arguing that the pretext nature of the traffic stop meant that all evidence should be suppressed and that the unavoidable lull doctrine should have no application at all, defendant did not contend that any seizure of defendant occurring before the dog sniff was an unlawful one; she simply contended that she was seized under both constitutions and that the dog sniff extended the seizure impermissibly.

In response, the state acknowledged that defendant was seized under the Fourth Amendment by virtue of the traffic stop alone but contended that Tux's sniff did not unconstitutionally prolong the stop under the analysis of *Rodriguez*. As for Article I, section 9, the state argued that defendant's interaction with Leininger "was effectively an encounter" and that Tux's sniff did not extend the traffic stop.

The trial court denied the motion. It first rejected defendant's contention that the pretextual nature of the stop requires suppression of the evidence: "So it is clear that there was, as the officers termed it, a drug mission, or a mission, and there were traffic violations that the officers testified to, and so those were the reasons that [the driver] was pulled over." The court then explained that "the question becomes, was this dog sniff—dog search on the exterior of the car done during the, what we call the unavoidable lull." Finding that the dog sniff "was happening at the same time" as the traffic investigation, the court ruled that the sniff did not extend the stop "and, therefore, probable cause for the drug investigation did not happen outside of the unavoidable lull."

Defendant was subsequently convicted as charged in a stipulated facts trial. She appealed and we initially affirmed without opinion. *State v. Soto-Navarro*, 298 Or App 554, 449 P3d 566 (2019). Defendant petitioned for review in

the Supreme Court. Following its decision in *Arreola-Botello*, the court allowed defendant's petition, vacated our decision, and remanded for reconsideration in light of *Arreola-Botello*. *State v. Soto-Navarro*, 366 Or 64, 455 P3d 37 (2019). On remand, the matter was submitted to a department of this court, which allowed the parties to submit supplemental briefing addressing *Arreola-Botello*. Thereafter, we took the matter into full court to review the trial court's ruling on defendant's motion to suppress under the standard set in *Arreola-Botello*. As always, we review that ruling by accepting the trial court's supported factual findings and determining "whether the trial court applied legal principles correctly to those facts." *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993).

The structure of the officers' street-crimes mission—in particular, the quick deployment of a drug-detecting dog during a pretextual but lawful traffic stop in a manner that comported with our court's unavoidable lull doctrine—complied with Article I, section 9, under our court's case law at the time of the mission, the time of the trial court's decision in this case, and the time of our initial decision. But the Supreme Court's decision in *Arreola-Botello* has changed that.

Under *Arreola-Botello*, "for the purposes of Article I, section 9, all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations." 365 Or at 712. "That means that all such activities, including inquiries, must be reasonably related to the purpose of the traffic stop or supported by an independent constitutional justification." *State v. Sherriff*, 303 Or App 638, 647, 465 P3d 288 (2020) (citing *Arreola-Botello*, 365 Or at 711-12; *State v. Watson*, 353 Or 768, 778-82, 305 P3d 94 (2013)). Accordingly, absent an independent constitutional justification, a drug-detecting dog like Tux generally cannot, consistent with Article I, section 9, sniff a car for drugs during a traffic stop. That is because most traffic violations will have nothing to do with drugs. *See, e.g.*, *Sherriff*, 303 Or App at 647 (concluding that there was "no plausible basis for concluding that" a sniff of a car by a drug-detecting dog "had any reasonable relationship to

citing [defendant] for a cracked windshield"). As explained by the Supreme Court, this rule operates to deter officers from converting minor traffic stops into criminal investigations in a way that undermines the freedoms protected by Article I, section 9:

> "If, after stopping an individual based on probable cause that the individual committed a traffic offense, an officer may inquire into criminal activity without reasonable suspicion of a specific crime, an officer will have less of an incentive to develop the requisite reasonable suspicion of that crime which ordinarily would be required to stop the individual for a temporary criminal investigation. By applying subject-matter limitations to investigative activities and questioning, Article I, section 9, ensures that officers do not turn minor traffic violations into criminal investigations without a constitutional basis for doing so."

*Arreola-Botello*, 365 Or at 713. And here that rule was violated by the deployment of Tux during a traffic stop for a rolling stop and a too-wide turn—neither of which have anything to do with drugs—without any independent constitutional justification for deploying him.

That would seem to require reversal. The trial court denied defendant's motion based on its conclusion that, on the facts of this case, the deployment of Tux was authorized under the unavoidable lull doctrine. But the unavoidable lull doctrine is no longer a valid doctrine, and, as noted, Tux's deployment does not comport with the subject-matter limitations that *Arreola-Botello* placed on traffic stops.

The state nonetheless argues that we must affirm. The state reiterates that, for purposes of Article I, section 9, a passenger is not *automatically* seized by virtue of a traffic stop of "the driver of a car." *State v. Stevens*, 364 Or 91, 93, 430 P3d 1059 (2018). Thus, according to the state, although the officers' conduct here did not comport with the Article I, section 9, subject-matter limitations on traffic stops recognized in *Arreola-Botello*, that conduct offended no right of defendant because she, unlike the driver, was not stopped. The state asserts that defendant's passenger-side status means that she cannot enforce the subject-matter limitations imposed on traffic stops by *Arreola-Botello* because "it is settled law that 'evidence may be suppressed only if

police invaded the personal rights of the person who seeks suppression; the violation of someone else's rights is not enough.'" (Quoting *State v. Makuch/Riesterer*, 340 Or 658, 670, 136 P3d 35 (2006).)

The state is correct that a traffic stop does not necessarily result in the seizure of passengers for purposes of Article I, section 9. *See Stevens*, 364 Or at 93. The state also is correct that, under the current case law, a person may not seek suppression of evidence to vindicate someone else's rights. In fact, in *State v. Ehret (A111249)*, we held that a passenger was not entitled to suppression of evidence obtained in violation of a driver's Article I, section 9, rights. 184 Or App 14, 19, 55 P3d 518 (2002), *rev den*, 337 Or 84 (2004). In reaching that conclusion, we relied on Supreme Court decisions holding that the Article I, section 9, exclusionary rule does not serve to deter police misconduct but, instead, operates to vindicate the personal interests of a person whose rights are violated. *Id.* at 18-20. And the state is correct that defendant has argued to us in her supplemental brief on remand that she should be able to obtain the suppression of evidence based on a violation of the driver's rights. But the state is incorrect that these points mean that defendant is not entitled to suppression.

As an initial matter, *Arreola-Botello* may have eroded our decision in *Ehret*, and the Supreme Court decisions on which it rested. At the very least, its analysis undercuts them. Part of the Supreme Court's explicit rationale for concluding that Article I, section 9, imposes subject-matter limitations on traffic stops was to prevent officers from transforming a traffic stop into an unconstitutional criminal investigation, specifically, "ensur[ing] that officers do not turn minor traffic violations into criminal investigations without a constitutional basis for doing so." *Arreola-Botello*, 365 Or at 713. That deterrence objective will be harder to realize if passengers cannot enforce the subject-matter limitations on traffic stops the same way that drivers can (particularly given the practical realities of the usual roadside traffic stop in which passengers have no genuine ability to leave, whatever their rights on paper). That makes it plausible to think that the Supreme Court contemplated that someone in defendant's position would be protected by

the subject-matter limitations on traffic stops identified in *Arreola-Botello*, even if passengers technically are not seized within the meaning of Article I, section 9, whenever officers make a traffic stop.[3]

Ultimately, those are questions for another case. That is because, in addition to her argument in her supplemental brief that she should be able to enforce the driver's rights under *Arreola-Botello*, defendant seeks to enforce her *own* rights. Defendant's theory of the suppression under the state constitution has never been that she was seized simply because she was a passenger in a stopped car. From the start, her theory was that officers engaged in a sufficient show of force upon stopping the car, and before the dog sniff, that she was seized, and then that seizure—the legality of which she did not contest in the trial court[4]—was unlawfully extended by the dog sniff. The parties argued before the court about the issue of whether defendant was seized before the dog sniff, and the trial court asked pointed questions on the issue.

Moreover, although the trial court never expressly stated that it had determined that defendant was seized before the dog sniff, its decision to resolve the case under the unavoidable lull doctrine suggests that the court first determined that defendant herself was seized. That is because the unavoidable lull doctrine presupposes an antecedent seizure, and also because, under years of our case law, the facts adduced in the trial court compel the conclusion that defendant was seized for purposes of Article I, section 9.

Regardless, even if the court did not reach the seizure issue itself, the record in the case allows for but one legal conclusion: Defendant was seized and then that seizure was unlawfully extended by Tux's sniff. *Cf. Sherriff*,

---

[3] The deterrence question may be one for the Supreme Court, given that court's (questioned) history of rejecting a deterrence-based rationale for Article I, section 9. *State v. Unger*, 356 Or 59, 94-103, 333 P3d 1009 (2014) (Landau, J., concurring).

[4] In her initial brief to this court, filed before the Supreme Court rejected the unavoidable lull doctrine that had been the focus of the parties' argument below, defendant changed course and argued for the first time that she had been seized before the dog sniff and that that seizure was unlawful because it was not supported by reasonable suspicion.

303 Or App at 645 (no remand required to allow trial court to address previously unaddressed factual and legal issues pertaining to seizure where "the record, viewed in the light most favorable to the state, allows for but one conclusion" on the relevant point).

*The seizure*: On these facts, it would be easy to conclude that defendant was seized from the very outset of the traffic stop. It is important to keep in mind that not all stops of cars are *traffic* stops; cars can be stopped for many different reasons. Under the circumstances here, defendant and the driver of the car had little reason to think that the stop was a traffic stop of the driver, as distinct from a criminal investigatory stop targeting both of them. There is no evidence that the Jetta was involved in any traffic violations after Gravel and Leininger started tailing it, so defendant and the driver would have had little reason to think they were being stopped for traffic violations. The officers' conduct of flanking the car would communicate to the occupants of the car that the show of authority was directed at both of them. Finally, neither officer testified that he had communicated to either the driver or defendant the basis for the stop; instead, each officer testified that he obtained identifying information from the person he was talking to. Under those circumstances, a passenger in defendant's position would not understand the officers' show of authority to be directed *solely* at the driver for the purpose of processing a traffic violation, contrary to the rationale for the rule that a traffic stop does not automatically result in a seizure of passengers. *See Stevens*, 364 Or at 100 ("Moreover, implicit [in the rule that passengers are not automatically seized by a traffic stop] is the proposition that the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them.").

But, at the very latest, Leininger seized defendant when he told her to keep her hands where he could see them. By now, we have concluded again and again that comparable directives about hand movement and placement are seizures for purposes of Article I, section 9. In *State v. Najar*, we determined that officers seized the defendant, who needed to reach for his wallet to obtain his identification,

when they told him, "Can I—keep your hands where I can see them. Go in with one hand." 287 Or App 98, 106, 401 P3d 1205 (2017) (internal quotation marks omitted). In reaching that conclusion, we observed that, quite similar to the circumstance here, "the encounter began when two officers approached, from either side, a parked car in which defendant was sitting with the driver's-side door closed; shined their flashlights into the car; knocked on the window to get defendant's attention; and asked him to produce his license." *Id.* at 106-07. If the defendant in *Najar* was seized, so was defendant here.

*Najar* does not stand alone. We have concluded that directives restricting hand movement are Article I, section 9, seizures time and again. *State v. Rudnitskyy*, 266 Or App 560, 564, 338 P3d 742 (2014), *rev den*, 357 Or 112 (2015) (the defendant was seized by order to place his hands on the dashboard); *State v. Shaw*, 230 Or App 257, 264-65, 215 P3d 105, *rev den*, 347 Or 365 (2009) (the defendant was seized by order to show his hands to the officer); *State v. Ruiz*, 196 Or App 324, 326-27, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005) (the defendant was seized by an order to remove his hand from his pocket). This is not a surprising line of cases.[5] An officer seizes a person under Article I, section 9,

―――――――――

[5] It is right in time with case law from other jurisdictions. *See People v. Boodle*, 47 NY2d 398, 401, 391 NE2d 1329, 1330-31 (1979) (concluding that a detective's order to "[j]ust keep your hands where I can see them" was a seizure because the defendant's "freedom of movement was significantly restrained"); *United States v. Serna*, 406 F Supp 3d 1084, 1091, 1094 (D NM 2019), *aff'd*, 806 Fed App'x 654 (10th Cir 2020) (unpublished) (defendant seized upon compliance with officer's instruction to "[k]eep your hands where I can see them"); *Gentry v. Sevier*, 597 F3d 838, 844 (7th Cir 2010) (effecting a seizure when officer told the defendant to "keep [his] hands up" (brackets in original)); *Verdier v. Borough*, 796 F Supp 2d 606, 623 (ED Pa 2011) ("[O]rdering Plaintiff to place his hands on the vehicle was a show of authority that would make it clear to a reasonable person that he was not free to leave."); *Beasley v. Commonwealth*, 60 Va App 381, 394, 728 SE2d 499, 505 (2012) (the defendant was seized when he submitted to police instructions to keep his hands on his lap where they could be seen); *Harrison v. State*, 627 So 2d 583, 584 (Fla Dist Ct App 1993) ("Florida district courts have consistently held that orders or even requests to remove a hand from a pocket causes a consensual encounter to become a seizure."); *State v. Andrade-Reyes*, 309 Kan 1048, 1055, 442 P3d 111, 117 (2019) (officer's command to the defendant to "[o]pen your hand" a significant factor in finding the defendant had been seized); *Geisler v. State*, No A-11266, 2014 WL 7345577 at *3 (Alaska Ct App Dec 24, 2014) (unpublished) (police order to the defendant and the defendant's passenger to "stop moving around and to keep their hands on their laps" a seizure); *United States v. Debona*, 759 Fed App'x 892, 898 (11th Cir 2019) (unpublished)

if the officer conveys to the person "either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Backstrand*, 354 Or 392, 401, 313 P3d 1084 (2013). In our "ordinary affairs," we have the freedom to move our hands freely, and a command from an armed, uniformed officer limiting that freedom most certainly communicates to a person that she is not free to go about her ordinary affairs (at least not without provoking a responsive use of force).[6]

    *The unlawful extension*: Allowing that the lawfulness of the seizure of defendant prior to the dog sniff was not contested, the only plausible constitutional justification for it on this record was for the purpose of ensuring officer safety during the lawful processing of the traffic stop. The state has never identified any theory or facts that, for purposes of Article I, section 9, would justify the seizure of defendant for any reason other than safety and lawfully processing the traffic stop of the driver for the rolling stop and too-wide turn. Consequently, because the only plausible justification for seizing defendant in the context of the traffic stop was to ensure the safe and lawful processing of

---

(the defendant not seized by polite request to "'please' not put his hands in his pockets" but would have been seized if ordered to do so); *United States v. Griffin*, 884 F Supp 2d 767, 775-76 (ED Wis 2012) (finding a seizure where the officer "drew his weapon and ordered defendant to show his hands"). *But see Bentley v. State*, 846 NE2d 300, 306-07 (Ind Ct App 2006) (officer's request that occupants of a vehicle "keep their hands where he could see them" was not a seizure; occupants only seized once officer ordered them out of vehicle); *Commonwealth v. Wright*, No 09-P-226, 77 Mass App Ct 1113, 2010 WL 2998672 at *2 (Aug 3, 2010) (decision issued pursuant to Massachusetts Appeals Court Rule 1:28) (officer request that the defendant "keep [his hands] where the officer could see them" not a seizure). To the extent we have cited unpublished opinions in this footnote, we have done so in accordance with the rules of the respective jurisdictions allowing for citation to unpublished decisions for their persuasive value.

    [6] That is not to say that the seizure of defendant necessarily was an *unconstitutional* one at its outset. Defendant's movements in the car may well have given rise to officer-safety considerations sufficient to justify the seizure under Article I, section 9. *See Shaw*, 230 Or App at 265-66 (officer's request that the defendant show him his hands was a seizure but it was a reasonable one in view of officer-safety concerns presented by fact that officer had observed the defendant carrying a hammer). As mentioned, except for the argument she made to the trial court about pretext stops, defendant did not contest the lawfulness of any seizure occurring before the dog sniff; her contention was that she was seized and then the seizure was *unlawfully extended* by the dog sniff. As a result, the trial court was not called upon to resolve whether any such seizure was justified by officer-safety concerns.

it, when Tux's sniff extended the traffic stop in violation of the subject-matter limitations recognized in *Arreola-Botello*, it also unlawfully extended the related ancillary seizure of defendant. Defendant's own rights under Article I, section 9, were violated by that unlawful extension, so her motion to suppress must be granted.

Reversed and remanded.

**DeVORE, J.,** dissenting.

This case is on remand for reconsideration in light of *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), because that decision ended the "unavoidable lull" concept, on which the trial court relied in part. The decision of the Supreme Court left this court with the commonplace question whether, absent the "unavoidable lull" rationale, defendant was unlawfully seized, under these circumstances, while a passenger in a car. The answer to that question necessarily begins with Oregon's well-established rule, discussed below, that a passenger is not seized during a traffic stop, within the meaning of Article I, section 9, of the Oregon Constitution. However, the majority opinion, like defendant's driver, makes a turn too wide, crossing over the Oregon passenger rule. Without swinging wide, we should have determined that no seizure occurred here, among other circumstances, when an officer asks a passenger, who is not yet the subject of investigation, to keep her hands visible for their mutual safety. We should have concluded that the trial court did not err in denying the motion to suppress.

## I.   FACTS

A.   *The Traffic Stop*

On the night in question, Hanted, the driver of a Volkswagen Jetta, committed two traffic infractions—rolling through a red light and an improper lane change. A detective in an unmarked car called dispatch for a marked car to make a traffic stop. Less than 30 seconds later, Washington County Deputy Gravel and Hillsboro Police Officer Leininger followed Hanted's Volkswagen. They were told that Hanted was on probation for possession of methamphetamine. They activated their overhead lights and chirped the siren for a block or two until Hanted finally

pulled over. Leininger observed the passenger, defendant, "moving around [and] ducking down" inside the car. Gravel and Leininger approached either side of the vehicle. Gravel spoke with Hanted and obtained his name, birthdate, and, eventually, his driver's license. Gravel noticed that the driver was a little nervous or "worked up" and "talking kind of fast." Gravel returned to the patrol car to begin a traffic citation.

Leininger had approached the passenger side of the car, and his initial "contact was brief." Defendant rolled the window down and seemed very "nervous." Given her prior movements, he said to her, "just keep your hands where I can see them," and the pair engaged in "a brief like small-talk conversation." He asked for defendant's name and date of birth, but he did not request or take any identification card. He relayed her information to dispatch about three minutes after the stop.[1]

Another deputy, DiPietro, had arrived at the scene. He approached the driver's side window as Gravel left to begin the citation. DiPietro inquired into whether any guns or drugs were in the car. He asked for consent to search the vehicle with a drug-detecting dog. The driver declined to give consent. DiPietro told the driver that he intended to walk the dog around the perimeter of the car, and then proceeded to do so.

When Leininger saw DiPietro and the dog arrive, Leininger stood near the car, but out of the way, observing. The dog's arrival cut short his "very abbreviated conversation" with defendant. During the dog's first walk-around or "sweep," the dog "alerted" on the passenger's side door, indicating that it had detected and located an odor.

Based on that alert, Leininger asked defendant to step out of the car. She did not immediately cooperate, and so Leininger insisted, "No, you need to step out of the vehicle."

---

[1] At the time of the suppression hearing, Leininger could not recall whether he radioed dispatch in front of or away from defendant. He explained that it was "normal" when there was a driver and passenger to contact the passenger— "[j]ust because you want officer safety stuff, but also just to find out who's in the car, identify people, if they're willing to talk to you." He did not tell her that she had to stay on the scene. In his opinion, "[s]he was free to leave at that point."

Once defendant exited the vehicle, Leininger asked for consent to search her person, to which she agreed. During that search, Leininger found a methamphetamine pipe with residue in defendant's jacket. The dog continued and alerted to a purse and a pouch on defendant's seat and the floorboard in front of it. In those bags, police discovered three ounces of methamphetamine, $3,231 in cash, a large number of empty plastic bags, a digital scale, pipes, and eight cellular phones.

B.   *Trial Court Proceedings*

Defendant was charged with possession and delivery of methamphetamine, ORS 475.894 (2016)[2] and ORS 475.890(2). Before trial, she moved to suppress all evidence "resulting from the illegal seizure and search." Defendant argued that officers unlawfully extended the duration of the traffic stop without reasonable suspicion and that any consent that they obtained thereafter was directly related to that illegal contact. Defendant claimed that she "was immediately seized, her name was run, the police officers had their lights and sirens on, they're armed, in uniform," and that, "subjectively or objectively, no one could think they could leave" under those circumstances. Defendant asserted that the evidence was therefore seized in violation of Article I, section 9, and required suppression.[3] The state argued, among other things, that the officers had not made a sufficient show of force to constitute a seizure of defendant and that DiPietro's actions and the drug dog were permitted during an unavoidable lull while Gravel awaited dispatch and worked on a citation.

In colloquy, defendant stressed that the officers were conducting a drug investigation in the guise of a traffic

---

[2] ORS 475.894 (2016), *amended by*, Or Laws 2017, ch 706, § 15; Ballot Measure 110, § 7 (2020), is the version that was in effect at the time of the incident in this case. As such, the subsequent amendments do not affect our analysis, and all references are to the 2016 version.

[3] In the trial court, defendant's focus was on the Fourth Amendment to the United States Constitution—something not pursued on appeal—while Article I, section 9, of the Oregon Constitution got secondary attention. Relying on federal precedent, defendant argued that the passenger was immediately seized when the car was stopped and the drug dog unlawfully extended the duration of the search as to her because it delayed writing the citation. At the suppression hearing, no attention was given to the officer's directions to defendant to keep her hands visible.

stop, and the traffic violations had been a mere pretext. The trial court challenged defendant for cases providing authority for the proposition that a stop for a traffic violation is not permitted if it is a pretext. Defendant conceded that "it's okay if officers have a pretext in mind," but defendant insisted that another motive impugned the "legitimacy" of the unavoidable lull idea. In response, the state cited cases rejecting motive arguments about so-called pretext stops.[4]

After checking authorities cited, the trial court stated that case law indicated that pretext stops are "still valid," if there are reasons for a stop like the traffic violations as in this case.[5] The trial court found that the dog search and alert occurred during an "unavoidable lull" while Gravel was issuing the citation and, as a matter of law, that the dog's alert established probable cause for further drug investigation.[6] The subsequent searches, the court explained, were justified by defendant's consent and the automobile exception to the warrant requirement. The court denied defendant's motion. The parties proceeded to a stipulated-facts trial, and defendant was convicted of both offenses.

C.  *Appellate Proceedings*

In her first set of arguments before this court, defendant contended that the evidence was the fruit of an

_____

[4] The state cited *State v. De La Rosa*, 228 Or App 666, 671, 208 P3d 1012 (2009) (an officer with probable cause to stop for a vehicle infraction was authorized to stop "regardless of whether his motive was to conduct a narcotics investigation"), and *State v. Olaiz*, 100 Or App 380, 786 P2d 734 (1990) (citing *State v. Tucker*, 286 Or 485, 488, 595 P2d 1364 (1979)) (rejecting pretext stop argument under both Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution).

[5] In *State v. Bea*, 318 Or 220, 228 n 5, 864 P2d 854 (1993), the Supreme Court noted:

"Defendant contends that the officer's stop of defendant for turning without signaling was a 'pretext' stop. Defendant himself correctly recognizes, however, that an 'officer's motives for an otherwise justifiable traffic stop are *** not relevant to the question of its validity.' *State v. Carter/Dawson*, 287 Or 479, 485, 600 P2d 873 (1979)."

[6] To the extent that defendant had argued that defendant was "immediately seized" before the dog's alert by stopping the car, the presence of uniformed officers, and running her identification, the court implicitly rejected defendant's individualized seizure argument—an alternative to her unlawful extension argument.

unlawful seizure. She argued that a reasonable person would not have felt free to leave when police surrounded the car, told her to keep her hands in sight, asked for and relayed to dispatch her name and birthdate, and circled the car with a drug dog. Those actions, defendant claimed, constituted a stop for which police lacked reasonable suspicion. She concluded that, because police discovered the evidence as a result of that unconstitutional seizure, suppression was required. We affirmed without opinion. *State v. Soto-Navarro*, 298 Or App 554, 449 P3d 566, *vac'd and rem'd*, 366 Or 64, 455 P3d 37 (2019).

Thereafter, the Supreme Court decided *Arreola-Botello*. In that opinion, the court held that, for the purposes of Article I, section 9, "an officer is limited to investigatory inquiries that are reasonably related to the purpose of the traffic stop or that have an independent constitutional justification." *Arreola-Botello*, 365 Or at 712. In other words, "an 'unavoidable lull' does not create an opportunity for an officer to ask unrelated questions, unless the officer can justify the inquiry on other grounds." *Id.* The court vacated our decision in this case and remanded it for reconsideration in light of *Arreola-Botello*. *State v. Soto-Navarro*, 366 Or 64, 455 P3d 37 (2019).

On remand to this court, defendant repeats that the evidence was the fruit of an unlawful search. She argues, for the first time on appeal, that circling the car with a drug dog constituted investigative activity unrelated to the traffic stop, and it therefore exceeded the subject-matter limitation of the stop under *Arreola-Botello*. Relatedly, she assumes that the search that is unlawful as to the driver is unlawful as to her, too. In her view, that unlawful activity led to the discovery of the evidence on her person and in her bags—places in which she held constitutionally protected privacy interests. Alternatively, defendant renews her argument that she was unlawfully seized, and asserts that the unlawful request and the unlawful dog sniff, in combination with other police conduct, constituted a show of authority sufficient to show that defendant would not have reasonably felt free to leave.[7]

---

[7] Defendant did not argue that the drug-detecting dog's inspection itself constituted a search under Article I, section 9.

The state argues that defendant misapplies *Arreola-Botello* to a passenger in a car lawfully stopped for a traffic violation. The state contends that *Arreola-Botello*'s limitations on police conduct during a lawful traffic stop apply only to a person who the police have actually seized for that stop. Under Article I, section 9, the state explains, only the driver, not the passengers, are seized during a traffic stop. Thus, even if the police have made an impermissibly unrelated investigative inquiry or engaged in unrelated activity like a dog sniff, they violated only the rights of the person who the law deems to be seized by the traffic stop—that is, the *driver.* After that point in time, the state notes that police lawfully searched defendant's person with her voluntary consent and lawfully searched her bags in the car under the automobile exception to the warrant requirement.

## II.  LAW

### A.  *Search and Seizure*

Article I, section 9, establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." A seizure occurs when "(1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *Arreola-Botello*, 365 Or at 701 (citing *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010)). "[A] seizure exists only if the officer's conduct would be reasonably perceived as coercive" and it "exceeds the bounds of ordinary social encounters between private citizens." *State v. Backstrand*, 354 Or 392, 400, 313 P3d 1084 (2013).

On one hand, "mere conversation" that is "non-coercive" and involves no restraint on liberty or freedom of movement does not constitute a seizure. *Arreola-Botello*, 365 Or at 701 (citing *State v. Rodgers/Kirkeby*, 347 Or 610, 621, 227 P3d 695 (2010)). On the other hand, arrests are considered seizures and require probable cause. *Id.* (citing *Rodgers/Kirkeby*, 347 Or at 621). Traffic stops fall "somewhere in between," because the motorist "'is legally obligated to stop at an officer's direction and to interact with

the officer, and therefore is not free unilaterally to end the encounter and leave whenever he or she chooses.'" *Id*. at 701-02 (quoting *Rodgers/Kirkeby*, 347 Or at 622-23) (internal ellipses omitted).

For some time, Oregon cases have limited the *duration* of a traffic stop to those things reasonably related to the purpose of the stop. *See, e.g.*, *Rodgers/Kirkeby*, 347 Or at 629-30 (impermissible extension of stops). As a result of that temporal limitation, the cases of this court had developed a doctrine of the "unavoidable lull," which permitted unrelated inquiries during a traffic stop so long as the inquiries did not unreasonably extend the duration of the stop. *See, e.g.*, *State v. Gomes*, 236 Or App 364, 372, 236 P3d 841 (2010) (so holding).

In *Arreola-Botello*, the Oregon Supreme court returned to the "constitutionally permissible scope of a traffic stop under Article I, section 9, of the Oregon Constitution." 365 Or at 697. The court said that the "narrow question" to be addressed in that case was "whether an officer's investigative *inquiries* during a traffic stop also must be reasonably related to the purpose of that stop." *Id*. at 705. (emphasis in original). The court concluded that

> "all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations. *** Put simply, an 'unavoidable lull' does not create an opportunity for an officer to ask unrelated questions, unless the officer can justify the inquiry on other grounds."

*Id*. at 712. With that, *Arreola-Botello* ended the unavoidable lull concept. Consequently, the Supreme Court vacated our decision in this case, which, like the trial court, had relied, in principal part, on the unavoidable lull doctrine and remanded the case for further consideration in light of existing law. That said, *Arreola-Botello* did not impugn prior case law on the passenger rule.

B.   *The Passenger Rule*

There should be no dispute that Oregon's rule on passengers in traffic stops is well-established. "Passengers

in a stopped vehicle—whether lawfully or unlawfully stopped—are not seized merely by virtue of their status as passengers." *State v. Ross*, 256 Or App 746, 754, 304 P3d 759 (2013). "[A]ll passengers in a vehicle subject to a valid traffic stop have been 'stopped' (at least physically) but, without more, have not been 'seized' as a constitutional matter." *State v. Thompkin*, 341 Or 368, 377, 143 P3d 530 (2006).

Only a year before *Arreola-Botello*, our Supreme Court rejected an argument that its own statements about Oregon's passenger rule were mere *dicta* that should be disclaimed or "overruled." *State v. Stevens*, 364 Or 91, 93, 430 P3d 1059 (2018). In *Stevens*, the defendant passenger had argued that "if the stop of the driver was * * * unlawful and she was stopped derivatively, then her stop was also unlawful." *Id.* at 97 n 2. She argued "that passengers in a stopped car would not feel free to walk away and that there are sound policy reasons for treating a stop of a car as a stop of the passengers." *Id.* at 99. The court determined, however, that implicit in the court's precedents "is the proposition that the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them." *Id.* at 200. The court adhered to its prior rulings "that stopping the driver of a car does not constitute a seizure of the passengers for purposes of Article I, section 9, of the Oregon Constitution." *Id.* at 93, 100.[8]

Generally, "a passenger is only seized when there has been the imposition, either by physical force or through some 'show of authority,' of some restraint on the individual's liberty." *Ross*, 256 Or App at 754 (internal quotation marks omitted). "[S]omething more than just asking a question, requesting information, or seeking an individual's cooperation is required of an officer's conduct," such as "the content

---

[8] The *Stevens* court then turned to the narrower question whether the conduct of the officer directed at the passenger herself constituted a seizure. The question became whether the officer "conveyed[ed] to [the] defendant 'either by word, action, or both, that [she was] not free to terminate the encounter or otherwise go about [h]er ordinary affairs.'" *Stevens*, 364 Or at 100 (quoting *Backstrand*, 354 Or at 401). The court held that the circumstances constituted a seizure when officers threatened trouble from defendant's parole officer if she were found to be providing her misinformation about the true identity of another passenger. *Stevens*, 364 Or at 101.

or manner of questioning, or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a 'threatening or coercive' show of authority requiring compliance with the officer's request." *Backstrand*, 354 Or at 403. Whether an officer has manifested a show of authority that intentionally and significantly restricts an individual's liberty is a fact-specific inquiry based on the totality of the circumstances. *State v. Parker*, 266 Or App 230, 234-35, 337 P3d 936 (2014).

If there has been a seizure, the fact that an officer exceeded the scope of a traffic stop does not automatically militate in favor of suppression of evidence. The questions of whether a search or seizure was unlawful and whether evidence is admissible are "separate inquiries." *State v. Rowell*, 251 Or App 463, 473, 283 P3d 454, *rev den*, 353 Or 127 (2012). Significantly, "evidence may be suppressed only if police invaded the personal rights of the person who seeks suppression; the violation of someone else's rights is not enough." *State v. Makuch/Riesterer*, 340 Or 658, 670, 136 P3d 35 (2006). "[I]t is not enough that police may have violated Article I, section 9, in some abstract sense." *State v. Brown*, 348 Or 293, 298, 232 P3d 962 (2010). Rather, "courts will suppress evidence only when a *defendant's* rights under Article I, section 9, have been violated." *Id.* (emphasis in original). A "search or seizure must violate the defendant's section 9 rights before evidence obtained thereby will be suppressed; a defendant's section 9 rights are not violated merely by admitting evidence in violation of section 9." *State v. Tanner*, 304 Or 312, 315-16, 745 P2d 757 (1987). In short, a defendant is not entitled to suppression unless *her* rights were the rights violated. *State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987) (A "'defendant cannot complain for the reason that if the right of any person was violated it was that of some other third person, and not that of the defendant.'" (Quoting *State v. Laundy*, 103 Or 443, 498, 204 P 958 (1922) (ellipses omitted).)). "[A]n officer who extends a traffic stop by investigating matters unrelated to the suspected traffic infraction committed by the driver may violate the constitutional rights of that driver by doing that, but such an unlawful extension of a traffic stop does not implicate the Article I, section 9, rights of the passenger unless that

passenger has been independently stopped as well." *State v. Graves*, 278 Or App 126, 132-33, 373 P3d 1197, *rev den*, 360 Or 465 (2016).

Accordingly, we have determined that, where police impermissibly extended a traffic stop, the passenger of the vehicle was not entitled to have evidence suppressed because it was the *driver's* rights—not the passenger's— that had been violated. *State v. Ehret (A111249)*, 184 Or App 14, 19, 55 P3d 518 (2002), *rev den*, 337 Or 84 (2004). In *Ehret*, an officer made a lawful traffic stop of the defendant's father, who was driving a car in which the defendant was a passenger. *Id.* at 16. The officer unlawfully extended the traffic stop's duration by asking the father to get out of the car, searching him, and questioning him extensively about narcotics. *Id.* After 15 minutes of questioning, the father admitted, in part, that the defendant possessed more than an ounce of marijuana. *Id.* Based on that information, the officer confronted the defendant. *Id.* The defendant reached into his pants and produced several baggies of marijuana, as well as construction paper containing LSD. *Id.* He said that the baggies contained marijuana and belonged to his father. *Id.* That prompted police to search the remainder of the car, where they discovered a large amount of cash and more contraband. *Id.* Partially based on evidence from that search, the defendant was charged with possession of a controlled substance. *Id.* at 16-17.

At trial, the defendant moved to suppress statements that he made to police, as well as evidence seized from the car. *Id.* at 16. The trial court denied that motion. *Id.* The defendant appealed, arguing, in relevant part, that the evidence was seized as the result of, or derived from, the unlawful detention of his father. *Id.* at 17. Specifically, he asserted that "the police traded on the violation of [his father's] right against an unreasonable seizure to unlawfully obtain admissions from [his father], which in turn prompted defendant to produce incriminating evidence from his person." *Id.* at 18. The defendant argued that the officer's use of the father's statements to confront him was "an unconstitutional use of a prior illegality that require[d] suppression under Article I, section 9." *Id.*

We disagreed. We observed that, when police confronted the defendant regarding his father's statements, no personal right of the *defendant* to be free from an unlawful search or seizure had been violated. *Id.* at 19. We explained that, "[a]lthough the police traded on a prior illegality (the detention of [the father]) to obtain the statements from [the father] that they used to confront [the] defendant, the *illegal* conduct was directed only at [the father]." *Id.* (Emphasis in original.) Defendant's own conduct had "waived" or "relinquished" his privacy interest in the baggies, and it triggered a lawful search of the remainder of the car based on probable cause and exigent circumstances. *Id.* We stated, "in the absence of a constitutional violation of defendant's personal rights that occurred before his voluntary production of the drugs, there is no ground for suppression." *Id.* at 19-20. We concluded, "[v]indication of the prior illegality can occur only by suppressing the evidence as to the individual ([the father]) whose rights have been violated." *Id.* at 20. We affirmed. *Id.* at 22.

Applying those principles, we should recognize that police exceeded the subject-matter scope of the traffic stop as to the driver, Hanted, but they did not thereby violate the rights of defendant, who was but a bystander to the violation of his rights. Defendant was not the person whose rights were violated. *See id.* (rejecting suppression based on the violation of the rights of another). In short, *Arreola-Botello* does not guide, nor answer, the question that remains in this case. Contrary to the majority opinion, *Arreola-Botello* does not rewrite Oregon's passenger rule.

C.    *The Majority Opinion*

Notwithstanding the Supreme Court's fresh affirmation of the passenger rule in *Stevens* and our clear decision in *Ehret*, the majority opinion in this case suggests that *Arreola-Botello* signaled a change that should imply that all passengers should be deemed to be unlawfully seized whenever a driver is unlawfully seized. The majority opinion posits that *Arreola-Botello* has "eroded" or "undercut" the *Ehret* decision and the Supreme Court decisions on which it rested. 309 Or App at 225. Although—legally speaking— Oregon courts have long agreed that a passenger could walk

away from a traffic stop of the driver, the majority opinion considers that a violation of the driver's rights could well be a violation of passengers' rights. The majority opinion reads *Arreola-Botello* expansively as based on a "deterrence objective." *Id.* Although the majority opinion does not decide the question, the majority opinion does not hesitate to observe it is "plausible to think that the Supreme Court contemplated that someone in defendant's position would be protected by the subject-matter limitations on traffic stops identified in *Arreola-Botello* \* \* \*." *Id.*

In my opinion, such expansive dicta is unnecessary, mistaken, and unfortunate for the legal debate that will ensue in cases to come. Four difficulties should explain why *Arreola-Botello* does not have the implications that the majority opinion imagines.

The first difficulty is that there is no meaningful difference to justify a distinction between *durational* and *subject-matter* limitations of Article I, section 9, involving a traffic stop. In their essence, they are the same constitutional violation. Consequently, *Arreola-Botello* is not such a new idea that it would justify a new approach to the passenger rule. Indeed, the Supreme Court's majority opinion wrote at length to show that the court's decision merely expresses the implied limitations of prior cases. *See Arreola-Botello*, 365 Or at 703-05 (reviewing cases). The decision abolished the unavoidable lull concept, but it did not purport to do anything dramatic.

The second difficulty is that *Arreola-Botello* said nothing to suggest changing Oregon's rule on passengers in traffic stops. Only a year before, the Supreme Court took the trouble to resolve any doubt that a passenger's rights were *not* violated *ipso facto* by an allegedly, unlawfully extended stop of a driver. *Stevens*, 364 Or at 96, 97 n 2, 100. The Supreme Court could not have been unaware of its recent affirmation of the passenger rule.

The third difficulty is that, if a passenger's rights were implicated by *Arreola-Botello*, then the Supreme Court would have taken review in this very case to address a passenger's rights under *Arreola-Botello* as the next logical step if it were indeed compelled by *Arreola-Botello*. The Supreme

Court would not have just remanded this case for our reconsideration of the other circumstances remaining in this case after abolition of the "unavoidable lull" rationale.

The final difficulty with the majority opinion is that it fundamentally changes the restorative remedy rationale for violations of Article I, section 9, of the Oregon Constitution. The majority opinion recognizes that in *Ehret* this court followed Supreme Court decisions holding that Article I, section 9, does not serve to deter police misconduct but, instead, works to vindicate the rights of the person whose rights are violated. 309 Or App at 225 (citing *Ehret*, 184 Or App at 18-20). Yet, now, the majority opinion would adopt a deterrence rationale, akin to the federal approach. And, that is not Oregon's approach.

The Oregon Supreme Court has repeatedly explained that, "'unlike the Fourth Amendment exclusionary rule, which has been based on deterring police misconduct, exclusions under Article I, section 9, have been based on the personal right to be free from an unlawful search and seizure.'" *State ex rel Juv. Dept. v. Rogers*, 314 Or 114, 119, 836 P2d 127 (1992) (quoting *State v. Kosta*, 304 Or 549, 553, 748 P2d 72 (1987)). Unlike the federal exclusionary rule on deterring police misconduct, the goal of the exclusionary rule in Oregon is to restore a defendant to the same position as if the government officers had stayed within the law by suppressing evidence obtained in violation of the defendant's rights. *State v. Unger*, 356 Or 59, 67, 333 P3d 1009 (2014). That means it is the *driver's* rights that are remedied, not the passenger's rights that have not been trammeled.

Although the majority opinion means well, rewriting Oregon's passenger rule and shifting from our individualized restorative remedy for a constitutional violation are tasks that are limited to the Oregon Supreme Court. That is so because that court has established controlling precedents on those issues.

D.  *Circumstances Short of Seizure*

If we do not turn wide but, instead, address directly the question presented on remand, we revisit whether

the officers made a show of authority that would constitute a personal seizure of defendant before they had reasonable suspicion of criminal activity. *See Ashbaugh*, 349 Or at 316 (seizure standard). I say that we "revisit" the question, because it is a question that defendant presented, to this court earlier when the case was before us then and presents now as an alternative argument.[9] On the same record with the same law, we *affirmed* on this issue, albeit without opinion. *Soto-Navarro*, 298 Or App 554. Now, based on the same evidence with the same law, the majority opinion *reverses*. Because the facts have not changed since our prior rejection of defendant's same argument about a personal seizure, the result should remain the same—absent a statement in the majority opinion, akin to an opinion on reconsideration, to explain that the majority's inconsistent outcome today is founded on an error of fact or law in our prior decision involving this same issue of personal seizure. *See* ORAP 6.25 (reconsideration standards).

When we approach the question, we remember that, if the trial court does not make findings on all pertinent facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion. *Stevens*, 311 Or at 127. The trial court rejected defendant's alternate argument about a seizure of defendant herself—a seizure, that is, before reasonable suspicion arose with the dog's alert.

For that reason, we should begin, contrary to the majority opinion, by accepting that the driver and defendant would have understood from their initial interaction with the officers that the situation started as a traffic stop. We should do so because Deputy Gravel immediately approached the driver, because Gravel gathered the information necessary to write a citation for traffic offenses, because he took that information back to write a citation for a traffic violation, because Officer Leininger took no identification card

---

[9] Compare Appellant's Opening Brief 11-15 (sole argument: personal seizure) with Appellant's Supplemental Brief 11-12 (alternate argument: personal seizure).

from defendant, and because he did not return to the patrol car to write her a citation.[10]

The majority opinion takes a different approach, choosing to assume that "defendant and the driver of the car had little reason to think that the stop was a traffic stop of the driver, as distinct from a criminal investigatory stop targeting both of them." 309 Or App at 227. The majority opinion states:

> "*There is no evidence that the Jetta was involved in any traffic violations after Gravel and Leininger started tailing it*, so defendant and the driver would have had little reason to think they were being stopped for traffic violations."

(Emphasis added.) To seize on that moment of time, to assert that there is "no evidence," is an advocate's account and contrary to our standard of review. In fact, the driver Hanted had just committed two traffic violations, reported by a detective, and the officers' patrol car had fallen in behind the Jetta within 30 seconds with overhead lights flashing.

The majority opinion next states that the officer did not testify that they told anyone the reason for the stop. *Id.* at 227. Although it is true that, at the suppression hearing, Gravel was not *asked* if he identified the traffic violations when he spoke with the driver, we do know that Gravel spoke with Hanted immediately; that Gravel asked him for his name and birthdate for the purpose of writing a traffic citation; that Gravel received Hanted's driver's license; and, upon gathering that information and without seeking more, Gravel returned to the patrol car to write the citation. Consistent with our standard of review and the trial court's ultimate conclusion denying the motion to suppress, we should accept that those facts indicated circumstances that the driver and defendant would initially see as a traffic stop.

The majority opinion concludes, in the least, that Leininger seized defendant when he told her to keep her hands where he could see them. 309 Or App at 227. Like this court when we reviewed the same facts before, I disagree. In my opinion, when considered in sum, the conduct

---

[10] Gravel and Leininger spoke with Hanted and defendant before DiPietro arrived and used the drug dog.

of Leininger toward defendant was not coercive, and it did not exceed the bounds of ordinary social encounters between private citizens. To be sure, he approached and, as a precaution, asked that defendant keep her hands where he could see them. If she complied, she could still move her hands wherever she might choose to put them. His request was for her cooperation in a way that was no more coercive than the cooperation sought when asking to see someone's identification—a request that is perfectly permissible yet more intrusive. *Backstrand*, 354 Or at 412, 416-17 (asking for identification is asking for a "form of cooperation" that is not a seizure). As such, his request for cooperation was a minimal and temporary interference at most. His direction was "a de minimis request" that would, if followed, alter her hand movement marginally and briefly, but not significantly restrict her liberty overall. *See State v. Cline*, 264 Or App 293, 299, 330 P3d 1255 (2014) (officer's request to "stay where you are" or "stay there," as defendant began to approach the police cruiser, was not a show of authority necessary for a seizure, but a de minimis request that, at most, slightly altered the location of an ongoing, casual, and consensual conversation); *Ross*, 256 Or App at 754 (something more than seeking an individual's cooperation is required of an officer's conduct to constitute a seizure); *cf. State v. Anderson*, 354 Or 440, 454, 313 P3d 1113 (2013) (order to get out of car constituted a seizure, given the officer's expressed disbelief in the veracity of the identification that the defendant provided); *State v. Rudnitskyy*, 266 Or App 560, 564, 338 P3d 742 (2014), *rev den*, 357 Or 112 (2015) (order to place hands on the car's dashboard constituted a seizure, where it was in direct response to the defendant's attempt to hide drug paraphernalia in his hands). His request for brief, minimal cooperation served no purpose other than to reduce the tension and risk to both people in a police-citizen encounter.

Leininger was not speaking to a driver who was the principal target of the police encounter; he spoke to a passenger; and he gave her no other directions or limitations on her movement beyond the initial request. *Cf. State v. Najar*, 287 Or App 98, 101-02, 401 P3d 1205 (2015) (officer confronting driver of car parked in suspicious circumstances, giving

directions to keep hands visible, and giving directions how to retrieve wallet from console).

Leininger inquired into defendant's name and birthdate and relayed that information to dispatch. He did not ask for, nor retain, any identification card so as to prevent defendant from leaving. *Backstrand*, 354 Or at 417 ("A request for identification, in and of itself, is not a seizure. Nor is an officer's act of checking the validity of that identification, in and of itself, a seizure."); *State v. Thompson*, 264 Or App 754, 759, 333 P3d 1125 (2014) ("[i]n ordinary encounters between, for example, a young-appearing would-be purchaser of alcohol and a seller, the seller's request for, and brief retention of, the purchaser's identification would not be considered coercive or extraordinarily unsocial," but if the seller "takes the card and holds it for an amount of time far in excess of what is necessary to confirm that it is genuine—say, for 30 minutes—the purchaser's freedom of movement has been *significantly* impaired" (emphasis in original)).

It is significant that, after that initial contact, Leininger engaged defendant in small talk that was brief. *See Graves*, 278 Or App at 136 (officer did not seize the defendant when he asked her to get out of the car in which she was a passenger, directed her toward the front of his patrol car, and began asking her questions about her parole status and criminal history, where the officer did not draw his weapon, raise his voice, or otherwise threaten defendant, and where the questioning was "easygoing"). Leininger did not tell defendant that she had to remain. He stopped and stepped back out of the way when DiPietro proceeded with the dog.

It is also significant that, in the brief "small talk," Leininger did not make accusations of wrongdoing or demands to see evidence. Leininger did not imply that defendant was under suspicion and would need to comply with his demands as a requisite to freedom. *See State v. Canfield*, 266 Or App 73, 82, 338 P3d 166 (2014) (officer did not stop the defendant by approaching, saying that the defendant was acting strange, briefly retaining identification, inquiring into potential drugs or weapons, and asking for consent

to search, where there was no indication that the officer was investigating any crime or that the defendant would not be free to leave until things were cleared up).

As for the other officers, they did not even address defendant. Gravel and DiPietro spoke exclusively to the driver, and, as for the drug dog, its mere presence or pass around the car, before its alert, did not indicate that defendant was seized. *See State v. Rosales*, 291 Or App 762, 766-67, 423 P3d 112 (2018) (dog sniff conducted in course of traffic stop was not seizure, regardless of whether the officer and the dog may have briefly blocked the passenger's door, where there was no direct or unambiguous accusation from officer that the passenger was in possession of drugs).

Up to the point of the dog's alert, nothing in the record suggests that Leininger's demeanor or manner or tone in talking to defendant was coercive. He did not brandish a weapon, shout, or threaten her. Nothing in the content or manner of his questioning, or his accompanying physical acts, would reasonably be construed as a threatening or coercive show of authority requiring compliance. In the context of the situation, the actions of Leininger were not a show of authority that amounts to a seizure.

The only aspect of this case that is new is that now we understand that driver Hanted's rights were violated, given *Arreola-Botello*. Accordingly, defendant has urged a combination theory dependent on the violation of the driver's rights. Defendant argues that the actions of the officers *in combination* with the illegality of their investigatory activities constituted a show of authority that would reasonably have made her feel not free to leave. In its essence, that argument is just a restated challenge to Oregon's passenger rule—that a passenger is not seized with a stop of the driver. It is a challenge restated to add that the stop was unlawful as to the driver. This court has rejected similar arguments before, and there should be no reason to reach a different conclusion here. *See, e.g.*, *Ross*, 256 Or App at 754 (rejecting the argument that the defendant was seized by virtue of being a passenger in a vehicle whose driver was purportedly improperly seized by an unlawful extension of a traffic stop).

Because violation of the driver's rights changes nothing, we are left with the same circumstances previously examined on appeal with defendant's alternate argument. Our answer should remain the same. Defendant's interaction with Leininger was consistent with what our case law has characterized as "non-coercive." It entailed small talk, including nonaccusatory, nonthreatening requests for information and cooperation. Gravel's and DiPietro's investigatory activities of speaking with the driver, seeking his consent to search the vehicle, and leading the dog around the perimeter were not directed at defendant, nor would they interfere with her ability to leave. None of the officers—through verbal commands, physical force, or otherwise—displayed a show of authority toward defendant that would impose a significant restraint on her liberty. Leininger's request that defendant keep her hands visible was only a de minimis request to assure their mutual safety. Under the totality of the circumstances, the officers did not seize defendant before having justification to do so; and, upon the dog's alert, they had cause for reasonable suspicion. *See State v. Helzer*, 350 Or 153, 156, 252 P3d 288 (2011) ("[A]n alert by a properly trained drug-detection dog can provide probable cause.").

## III.   CONCLUSION

In my opinion, the trial court did not err in denying defendant's motion to suppress (a) because she was not seized prior to the time when officers had reasonable suspicion when the drug dog alerted, (b) because the facts have not changed since we previously rejected defendant's alternate argument about a personal seizure, (c) because we have not explained a reason to reconsider the same facts to reach a different result, and (d) because *Arreola-Botello* did not impugn Oregon's passenger rule. To conclude otherwise invites unnecessary uncertainty and unnecessary debate in cases yet to come. Worse yet, to conclude otherwise risks the safety of citizens and officers in Oregon's traffic stops.

I respectfully dissent.

Tookey J., and Mooney J., join in this dissent.